## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

TENISHA N. JIGGETTS       :
4702 Megan Drive          :
Clinton, Maryland 20735    :
                          :
     and             :
                          : Civil Action Number:
KAREN W. COOPER       :
4426 Ninth Street, N.W.    :
Washington, D.C. 20011     :
                          :
     Plaintiffs,      :
                          :
     v.               :
                          :
DANIEL W. CIPULLO      :
500 Indiana Avenue, N.W.  :
Washington, D.C. 20001     :
                          :
     and             :
                          :
RICHARD PARRIS        :
500 Indiana Avenue, N.W.  :
Washington, D.C. 20001     :
                          :
     and             :
                          :
ANNE B. WICKS         :
500 Indiana Avenue, N.W.  :
Washington, D.C. 20001     :
                          :
     and             :
                          :
DR. CHERYL R. BAILEY   :
500 Indiana Avenue, N.W.  :
Washington, D.C. 20001     :
                          :
     and             :
                          :
YVONNE MARTINEZ-VEGA :
500 Indiana Avenue, N.W.  :
Washington, D.C. 20001     :
                          :
     and             :

|  | : |
|---|---|
| **NANCY MCKINNEY** | : |
| **500 Indiana Avenue, N.W.** | : |
| **Washington, D.C. 20001** | : |
|  | : |
| **and** | : |
|  | : |
| **BELINDA CARR** | : |
| **500 Indiana Avenue, N.W.** | : |
| **Washington, D.C. 20001** | : |
|  | : |
| **and** | : |
|  | : |
| **THE DISTRICT OF COLUMBIA** | : |
| **A Municipal Corporation** | : |
| **441 Fourth Street, N.W.** | : |
| **Washington, D.C. 20001** | : |
|  | : |
| **SERVE:** | : |
| **The Honorable Muriel Bowser** | : |
| **Executive Office of the Mayor** | : |
| **1350 Pennsylvania Avenue, NW** | : |
| **Suite 316** | : |
| **Washington, DC 20004** | : |
|  | : |
| **Karl A. Racine, Attorney General for** | : |
| **The District of Columbia** | : |
| **441 4th Street, NW** | : |
| **Suite 650** | : |
| **Washington, DC 20004** | : |
|  | : |
|  | : |
| **Defendants.** | : |

==================================

## **COMPLAINT**

Comes now plaintiffs Tenisha Jiggetts ("Jiggetts") and Karen Cooper ("Cooper"), by and

through undersigned counsel, Billy L. Ponds, of The Ponds Law Firm, respectfully submit this

Complaint against Daniel W. Cipullo ("Cipullo"), Richard Parris ("Parris"), Anne Wicks

("Wicks"), Dr. Cheryl R. Bailey ("Bailey"), Yvonne Martinez-Vega ("Martinez-Vega"), Nancy

McKinney ("McKinney"), Belinda Carr ("Carr") and the District of Columbia. In support of their respective claims, Jiggetts and Cooper state as follows:

## JURISDICTION AND VENUE

1.      Plaintiffs assert that this Court has jurisdiction under 42 U.S.C. §1983, 28 U.S.C. §1331, et. eq., 28 U.S.C. §1343(a)(3) for all statutory and constitutional claims, and has supplemental jurisdiction pursuant to 28 U.S.C. §1367. The amount of controversy herein, excluding interest and costs, exceeds the minimum jurisdictional limit of this Court.

2.      Venue is proper because all of the material underlying conduct and events which form the basis of this cause of action occurred within the District of Columbia and the District of Columbia is a party.

## PARTIES

3.      Jiggetts is an African-American female over the age of eighteen who at all relevant times herein was an employee of the District of Columbia, serving as the attorney-advisor to the Criminal Division at the Superior Court of the District of Columbia ("DC Superior Court").

4.      Cooper is an African-American female over the age of eighteen who at all relevant times herein was an employee of the District of Columbia, serving as a supervisor in the Criminal Division at DC Superior Court.

5.      The District of Columbia is a municipality with the authority to sue and be sued and, among other things, is responsible for the personnel of the DC Superior Court.

6.      At all relevant times herein, Cipullo as Director of the Criminal Division, Parris as Chief Security Officer, Wicks as Executive Officer, Bailey as Acting Clerk of the Court, Martinez-Vega as Deputy Director of the Criminal Division, McKinney as Program Director, and Carr as Special Proceedings Branch Chief were employees of the District of Columbia at the DC Superior

Court, and at all relevant times, all were acting within the scope of their employment and are being sued in their official and individual capacities.

## FACTS: PATTERN AND PRACTICE OF HARASSMENT, DISCRIMINATION AND RETALIATION AT DC SUPERIOR COURT

7.     Upon information and belief, from at least 2010 until at least the time Jiggetts' and Cooper's employment was terminated in 2015, Cipullo and other managers in the Criminal Division at the DC Superior Court possessed a racial animus towards female African-American employees that was intentionally and openly displayed.

8.     Managers and other individuals at the DC Superior Court with the ability to remedy this racial discrimination and harassment, including but not limited to Wicks, Bailey, Cipullo, and Martinez-Vega had actual and constructive notice of it for the entirety of Jiggetts' and Cooper's tenure, and intentionally took no action.

9.     Managers and supervisors, including but not limited to Wicks, Bailey, Cipullo, and Martinez-Vega participated in and/or witnessed firsthand various acts of harassment and discrimination towards African-American employees, which provided the District of Columbia with actual notice of the discrimination and harassment.

10.     Numerous employees filed internal and external complaints regarding the harassment and discrimination of African-American employees, which provided the District of Columbia with actual notice of the discrimination and harassment

11.     The racial harassment and discrimination towards African-American employees was so pervasive that the District of Columbia had constructive notice of it.

12.     Cipullo, and other managers and supervisors at the DC Superior Court, actively worked to prevent African-Americans from being transferred, hired and promoted, solely due to their race, and took action to ensure that Caucasian individuals were chosen instead.

13.     During his tenure at DC Superior Court in the Criminal Division, Cipullo often called female African-American employees derogatory names and openly made statements that he had problems working with African-American women.

14.     Cipullo, and others at the DC Superior Court, actively worked to promote Caucasian employees for transfers, promotions and hiring solely due to their race, and took action to ensure that Caucasian individuals were chosen for the afore-mentioned over African-American employees.

15.     In 2010 or 2011, Cipullo created the position of "Program Manager" at a salary grade of GS-14.

16.     During a meeting with senior managers, including Jiggetts and Cooper, regarding the aforementioned new Program Manager position, Cipullo described the duties of the position, which fit the current duties of McKinney, a Caucasian employee.

17.     In the aforementioned meeting, Cipullo stated, referring to McKinney, "If I could just give her the job I would, but HR says I have to advertise first."

18.     Upon information and belief, Cipullo made the aforementioned statement in order to discourage African-American employees from applying for the Program Manager position.

19.     Upon information and belief, at the time Cipullo created the Program Manager position, he was determined to ensure McKinney was promoted to that position.

20.     Upon information and belief, Cipullo tailored the aforementioned position specifically for McKinney, in order to hedge against the risk of any complaints that he was discriminating against African-American employees who applied for the position.

21.     Numerous African-American employees who were as qualified, or more qualified, than McKinney applied for the Program Manager position.

22.     Cipullo hired McKinney for the aforementioned Program Manger position.

23.     Upon information and belief, the sole reason that Cipullo did not hire any African-American employees for the Program Manager position was solely due to their race.

24.     McKinney, as Program Manager at GS-14, was the highest grade of staff in the Criminal Division, despite the fact that she only had a high school diploma.

25.     Cipullo promoted a Caucasian employee over Cooper, despite the fact that Cooper was more qualified and had more seniority than the Caucasian employee.

26.     There was a disparity in the disciplinary and corrective actions taken against African-American female employees, as they were generally punished or penalized more severely than similarly situated non African-American employees.

27.     Shortly after McKinney was promoted to Program Manager in 2011, while attempting to program the DC Superior Court database known as "Court View", McKinney caused the entire system to crash court-wide.

28.     The aforementioned crash of "Court View" significantly disrupted the DC Superior Court's operations.

29.     Upon information and belief, DC Superior Court took no adverse or corrective action as a result of McKinney's actions.

30.     Upon information and belief, in 2013 a white/Hispanic male employee was neither disciplined nor was any corrective action taken against him when he concealed, over the course of several months, numerous Court orders issued by the District of Columbia Court of Appeals for criminal cases. This gross failure to process orders negatively affected the Criminal Division's operations and criminal defendants' rights.

31.     Upon information and belief in 2010, a Caucasian female Criminal Division employee, attempted to impermissibly and deliberately use her DC Superior Court ID in order to gain access to the Office of the United States Attorney for the District of Columbia Executive Offices for personal reasons.

32.     The aforementioned employee was not suspended or terminated for her egregious conduct.

33.     This employee subsequently sought a transfer and Cipullo supported this request.

34.     African-American employees, including but not limited to, Jiggetts and Cooper, were punished and even terminated for alleged similar and lesser offenses than those of similarly situated non African-American employees, who were not punished.

35.     Cipullo re-assigned a female African-American Courtroom Clerk Trainer in the DC Superior Court Criminal Division and designated an office that was in a remote area of the courthouse and under construction.

36.     Cipullo segregated this employee from all of other Criminal Division employees and she was subjected to working in an office full of tools, debris, open cans of paint, buckets and other hazardous materials without security, controlled entry or the ability to lock her office.

37.     Upon information and belief, the employee's race was the motivating factor for Cipullo's decision, and Cipullo had no legitimate, nondiscriminatory reason for the re-assignment.

38.     The aforementioned employee filed an EEOC Complaint against Cipullo in 2014 alleging disparate treatment and a hostile environment based on her race.

39.     In October 2014, McKinney, directed Cooper to write a letter of concern to an African-American female employee over Cooper's objection regarding this employee's leave balance despite the fact that she had  seventy hours of annual leave remaining at that time and there was no Court policy requiring employees to maintain a minimum number of leave hours annually.

40.     Similarly situated non African-American employees had substantially less available annual leave, but upon information and belief, they were not issued a letter of concern regarding their leave balance.

41.     In or around October or November 2013, the DC Superior Court hosted a judicial conference, and mandated that all branch chiefs, supervisors, and attorney-advisors from the Criminal Division work at the conference.

42.     McKinney was not required to work at the conference, despite the fact that other similarly situated African-American employees were required to work at the conference.

43.     Upon information and belief, McKinney was not required to work at the conference solely due to her race.

44.     All of the African-American employees who were mandated to work at the conference were directed to register attendees, print badges, direct attendees to rest rooms, and serve attendees lunch.

45.     The African-American employees protested being required to do menial labor at the conference and not being involved in any substantive or professional capacity.

46.     Cipullo responded to the aforementioned protest in a hostile and aggressive manner, and provided no explanation why McKinney did not have to participate in the conference.

47.     Upon information and belief, Cipullo intentionally assigned African-American employees menial tasks at the aforementioned conference, and did not allow them to be involved in any substantive or professional capacity, solely due to their race.

48.     During Jiggetts and Cooper's tenure, African-American women were subjected to harassment and sexual harassment.

49.     On or about April 4, 2014, Cipullo grabbed and thrust his groin in an obscene and sexually offensive manner during an office birthday party, during court hours, which was attended almost exclusively by African-American female employees who were offended by his conduct.

50.     The aforementioned incident on April 4, 2014, was captured on camera by the DC Superior Court security camera system.

51.     Upon information and belief, Court Security Officer's ("CSO") targeted African-American females for sexual harassment due to their race.

52.     A female African-American employee at the DC Superior Court filed internal complaints dating back to 2005 up until at least 2013, regarding sexual harassment that she was subjected to by CSOs.

53.     Wicks had actual knowledge of the aforementioned sexual harassment complaint, but upon information and belief she took no corrective, remedial or disciplinary action in response to this conduct.

54.     Subsequent to the sexual harassment complaints, one of the CSOs accused of sexual harassment was promoted.

55.     In July 2015, an African-American female reported harassment and discrimination of female African-American employees in the Criminal Division to Martinez-Vega. In the

aforementioned report, she stated that this harassment and discrimination had been going on for a substantial period of time.

56.     In the aforementioned report, the African-American female stated that the DC Superior Court Criminal Division had a work culture that included disparaging comments by supervisors to their subordinates, supervisors admonishing employees who sought assistance or clarification, and supervisors showing preferential treatment to certain employees.

57.     In the aforementioned report, she stated that this type of conduct had been prevalent for so long that employees accept it as the status quo, either because they are numb to it or fear retaliation if they complain.

58.     Upon information and belief, she was referencing racial harassment and discrimination in her aforementioned report.

59.     Alicia Shepard ("Shepard"), Branch Chief of the Criminal Division, also displayed an open animus to African-American employees at the DC Superior Court.

60.     On or about March 23, 2016, Shepard recorded a video on her cell phone at the DC Superior Court, which included disparaging comments regarding the work ethic of African-American employees in the Criminal division.

61.     In the aforementioned video, Shepard stated to the employees she manages "I hate ignorant black folk, they get on my nerve" immediately after she spoke with a female African-American employee.

62.     Shepard subsequently published the aforementioned video on "Facebook."

63.     Despite being fully aware of the video published on Facebook, DC Superior Court managerial personnel, upon information and belief, chose not to initiate any disciplinary, remedial or corrective action against Shepard.

64.     In response to the video, and the custom, policy and practice at the DC Superior Court for discrimination and harassment of African-American employees, a female African-American employee filed an internal complaint for racial harassment and discrimination with Human Resources.

65.     Subsequent to the video incident, Shepard sent an email to all DC Superior Court Criminal Division employees, referring explicitly to the aforementioned video recording she made, and stating that "Over the years, we have all joked with each other regarding what it is we are doing during work hours; the comments in the video were simply one of those moments."

66.     Upon information and belief, Shepard was admitting that racial harassment, similar to the comments made in the video, had been going on for years at the DC Superior Court in the Criminal Division.

67.     On or about April 20, 2016, Cipullo held a meeting with all of the DC Superior Court Criminal Division employees to discuss the incident.

68.     During the aforementioned meeting, Cipullo stated that McKinney would replace Shepard as Branch Chief of the Criminal Division, and that Shepard would take McKinney's current position.

69.     During this meeting an African-American female employee who was the victim of racial harassment by McKinney in the past, asked if Cipullo would consider any other choices for Branch Chief of the Criminal Division.

70.     Another African-American employee present at the meeting also confronted Cipullo about McKinney's past racial harassment and discriminatory conduct, but he dismissed such concerns as an urban legend and placed McKinney in Shepard's position.

71.     After the aforementioned meeting, some employees stated that the video incident should never have been reported, and that anyone offended by the video should have taken their concerns directly to Shepard.

72.     Cipullo voiced his agreement with the aforementioned statements regarding not reporting the video incident.

73.     Upon information and belief, Cipullo's actions demonstrate that a policy, procedure and custom of suppressing and discouraging reports of racial harassment and discrimination had been present at the DC Superior Court Criminal Division for some time.

74.     Human Resources responded to the aforementioned complaint against Shepard on or about May 10, 2016, and found that the allegations investigated had been substantiated, and that Cipullo would determine the appropriate action, if any, to be taken.

75.     Upon information and belief, the only action taken was to move Shepard to McKinney's position, and move McKinney to Shepard's position, from May until September 2016.

76.     Upon information and belief, during Shepard's tenure she placed a picture of a swastika on an employee's door and no adverse or corrective action was taken by Cipullo.

77.     The aforementioned incidents, involving Jiggetts, Cooper and other female African-American DC Superior Court Criminal Division employees, establish that the DC Superior Court has had a longstanding policy, practice and custom of racial harassment and discrimination that existed at the time Jiggetts and Cooper were employed in the Criminal Division and had a detrimental impact on them throughout their tenure at the DC Superior Court Criminal Division.

78.     The incidents that occurred after Jiggetts and Cooper were terminated highlights the discrimination that was present when Jiggetts and Cooper were employed at the DC Superior Court Criminal Division, providing further evidence that the DC Superior Court had a longstanding policy, practice and custom of racial discrimination towards African-American employees.

79.     The incidents described herein demonstrate that managers and supervisors with final policymaking authority, including but not limited to Cipullo, McKinney, Martinez-Vega, Wicks and Bailey, had an open racial animus towards African-Americans.

## **FACTS: TENISHA JIGGETTS**

80.     In July 2004, Jiggetts was hired as an attorney-advisor for the DC Superior Court Probate Division, where she served until June 2008.

81.     In June 2008, Jiggetts was transferred to an attorney-advisor position for the DC Superior Court Criminal Division, at salary grade GS-13.

82.     Jiggetts served as an attorney-advisor in the Criminal Division at GS-13 until DC Superior Court terminated her employment on April 4, 2015.

83.     Jiggetts had a lower salary grade as a Criminal Division attorney-advisor than similarly situated Caucasian attorney-advisors.

84.     Upon information and belief, the motivating factor for Jiggetts' lower pay was her race.

85.     Wicks, who at all relevant times herein was Executive Officer, was fully aware of the income disparity between Jiggetts and the Caucasian attorney-advisors, but intentionally took no action to correct it.

86. On December 27, 2011, Jiggetts was asked to chair the Criminal Division's Great Place to Work Committee ("Committee").

87. The Committee was established in response to a survey of the DC Superior Court Criminal Division employees which showed morale among non-managerial employees was very low.

88. Upon information and belief, morale was low due to the intentional and open display of racial discrimination by the DC Superior Court Criminal Division management towards African-American employees.

89. The Committee was a means to facilitate a safe and confidential environment for employees to complain about management and members of the committee were required to safeguard the identity of the employee making the complaint.

90. The aforementioned stated purpose for the Committee was pretextual, as upon information and belief, the Committee was formed in order to identify and punish African-American employees who voiced concerns about management.

91. Cipullo and Martinez-Vega asked Jiggetts to disclose the identities of all employees who lodged complaints, despite the fact that Jiggetts was instructed not to do so in the Committee guidelines, and the complaints were submitted under the promise of anonymity.

92. When Jiggetts would not disclose the identities of the employees who lodged complaints, Cipullo and Martinez-Vega attempted to intimidate and bully her into doing so.

93. During his tenure at DC Superior Court in the Criminal Division, Cipullo retaliated against African-American employees for voicing complaints about racial harassment and discrimination.During the time Jiggetts was an employee at DC Superior Court performance evaluations were measured on a numerical scale of one (1) to five (5); employees who earned a

four (4) or five (5) rating received a performance bonus; and performance evaluations are required when applying for transfers and promotions within the Court.

94.     From 2005 to 2007, Jiggetts received a rating of five (5) in her performance evaluations. From 2010-2012, she received a rating of (4) in her performance evaluations.

95.     In August 2013, Jiggetts did not receive her 2013 Performance Evaluation because, instead of proceeding with the performance evaluation process, Cipullo decided to use a survey for the purpose of evaluating the performance of both Jiggetts and her law clerk

96.     Once Cipullo received the results of the survey, he refused to share those results with Jiggetts.

97.     Upon information and belief, Cipullo intentionally withheld Jiggetts' 2013 performance evaluation solely due to her race, and in order to adversely impact her employment, including but not limited to, her ability to be transferred, promoted and receive a performance bonus.

98.     Throughout 2013 and 2014, Jiggetts applied for positions in other divisions of the DC Superior Court.

99.     Jiggetts was qualified for all of the positions that she applied for, but she was not hired for any of those positions.

100.    In or around May 2013, Jiggetts applied for a Senior Operations Manager Position for the Clerk of the Court.

101.    Despite the fact that Jiggetts was qualified for the aforementioned Senior Operations Manager Position, she was not given an interview.

102.    Cipullo was on the selection panel for the Senior Operations Manager Position, and used his influence to prevent Jiggetts from being interviewed for this position.

103.   A DC Superior Court judge contacted the Clerk of the Court and provided a recommendation in support of Jiggetts' application for the Senior Operation Manager position.

104.   Cipullo admonished Jiggetts because a Judge made this recommendation in support of her application for the Senior Operations Manager although such recommendations were routinely made for Caucasian applicants.

105.   A Caucasian female applicant who was less qualified than Jiggetts was hired to fill the aforementioned Senior Operations Manager position.

106.   Upon information and belief, Cipullo sabotaged Jiggetts' attempts to transfer to another division, by, including but not limited to, withholding her performance evaluations and making false negative comments about her and her performance to other directors.

107.   On or about October 27, 2014, Jiggetts applied for an attorney-advisor vacancy in the Family Division.

108.   Cipullo took measures to prevent Jiggetts from being hired to the aforementioned position and to ensure that a less-qualified Caucasian individual was selected instead.

109.   On or about June 2014, Jiggetts met with Duane Delaney ("Delaney"), Clerk of the Court, and renewed her request to be transferred to another division, but she could not be transferred because she had not received her performance evaluation from Cipullo.

110.   During the aforementioned meeting, Jiggetts advised Delaney that she had not yet received her 2013 performance evaluation from Cipullo.

111.   In 2014, Cipullo provided Jiggetts with her 2013 performance evaluation almost one year after its due date and this evaluation misrepresented her performance.

112.   Upon information and belief, Cipullo intentionally misrepresented Jiggetts' performance solely on the basis of her race.

113.    Jiggetts refused to sign the 2013 performance evaluation due to the misrepresentation of her performance, and filed the unsigned evaluation with the DC Superior Court Human Resources Division on July 9, 2014, with an attached addendum identifying her professional achievements from 2013.

114.    On July 18, 2014, Jiggetts filed a grievance with Delaney regarding Cipullo.

115.    Jiggetts filed the aforementioned grievance regarding Cipullo's discriminatory treatment of her, and his bullying and harassment of her.

116.    After Jiggetts filed her grievance, Cipullo repeatedly asked her to withdraw her grievance.

117.    When Cipullo learned that Jiggetts' would not withdraw her grievance he responded that "If she wants war, we can go to war."

118.    On or about August 5, 2014, Jiggetts properly applied for FMLA leave, which was granted from August 20, 2014 until August 25, 2014.

119.    Jiggetts was also granted FMLA leave to work on an intermittent basis starting August 26, 2014, and did not work full-time while on FMLA leave.

120.    During Jiggetts' intermittent FMLA leave, Cipullo and Martinez-Vega were aware that she was working a reduced schedule, and that her only staff member, law clerk Angela Lee ("Lee"), an Asian-American, was also on FMLA leave and therefore unable to assist Jiggetts.

121.    Cipullo and Martinez-Vega assigned Jiggetts a disproportionately high workload, including tasks and assignments in addition to her normal duties, while she was on FMLA leave, and provided her with insufficient time to complete the assigned tasks.

122.    While Jiggetts was on FMLA leave, Cipullo was responsible for monitoring halfway house placements and the halfway house log.

123.    Cipullo did not properly monitor halfway house placements or the halfway house log while Jiggetts was on FMLA leave.

124.    No disciplinary or corrective action was taken against Cipullo for his failure to properly monitor halfway house placements and the halfway house log.

125.    Upon information and belief, Cipullo and Martinez-Vega intentionally took the aforementioned actions during Jiggetts' FMLA leave in order to interfere with Jiggetts' ability to take FMLA leave.

126.    On September 2, 2014, Jiggetts received Delaney's reply to the grievance submitted on August 15, 2014, which stated that there was no written policy dictating when an employee should receive their performance evaluation.

127.    The aforementioned reply was contrary to statements made by the DC Superior Court Human Resource's Division, which specified certain deadlines regarding the completion and submission of performance evaluations.

128.    On September 22, 2014, Jiggetts filed a federal EEOC Charge of Discrimination regarding harassment, retaliation, a hostile work environment and racial discrimination that she and other African-American employees were subjected to at the DC Superior Court, including but not limited to, through the acts and omissions of Cipullo.

129.    Shortly after Jiggetts submitted her EEOC Charge, Cipullo was notified of the EEOC Charge that Jiggetts filed.

130.    On or about September 25, 2014, Cipullo requested that Jiggetts provide him with all of her work-product from the prior two (2) week period for his review.

131.    On or about September 25, 2014, Jiggetts sent all of the requested work-product to Cipullo.

132.    On or about October 1, 2014, Cipullo admitted that Jiggetts was the only manager required to submit her entire work-product for his review. Upon information and belief, no other managers were requested to submit their work-product for a period like Jiggetts was.

133.    Upon information and belief, Cipullo requested Jiggetts' aforementioned work-product solely on the basis of her race, and in response to her formal complaints made against him for racial discrimination and harassment.

134.    Upon information and belief, Cipullo requested the aforementioned work-product because he sought to find a pretextual reason to terminate Jiggetts' employment.

135.    Throughout the month of October 2014, Cipullo and Martinez-Vega sent Jiggetts fifty-nine (59) emails, which is significantly higher than the ten (10) emails that Jiggetts received in October 2013.

136.    Upon information and belief, Cipullo and Martinez-Vega sent Jiggetts a disproportionate number of emails compared to other employees at the DC Superior Court.

137.    Upon information and belief, Cipullo and Martinez-Vega were attempting to pressure Jiggetts with an excessive workload in order to force her to leave.

138.    Upon information and belief, Cipullo and Martinez-Vega were attempting to inundate Jiggetts' with excessive work in order to develop a pretextual reason to terminate her employment.

139.    During Jiggetts tenure at the Criminal Division, she and the majority of other employees in that division worked a schedule that included an extra hour of work four (4) days a week, and then a compressed day off ("CDO") every other Friday.

140.    On or about October 9, 2014, Martinez-Vega abolished Jiggetts' CDOs.

141.    Martinez-Vega, and other non African-American Criminal Division employees were still able to take CDOs.

142.    Upon information and belief, Martinez-Vega abolished Jiggetts' CDOs solely on the basis of Jiggetts race, and in retaliation for Jiggetts' reporting incidents of harassment and racial discrimination.

143.    Upon information and belief, there was no operational need to abolish Jiggetts' CDOs.

144.    During a meeting between Jiggetts and Cipullo on November 4, 2014, Cipullo acted in an aggressive and threatening manner towards Jiggetts, which upon information and belief was in response to her filing of the EEOC Charge on September 22, 2014.

145.    Jiggetts abruptly left the aforementioned meeting due to her fear of Cipullo, based on his inappropriate conduct.

146.    Upon information and belief, Cipullo deliberately acted threatening and aggressive towards Jiggetts in order to intimidate her from any future attempts to speak out about his treatment of her and other African-American employees.

147.    Jiggetts immediately reported the November 4, 2014 incident to Bailey, the new Clerk of the Court. Bailey responded by informing Jiggetts that walking out of a meeting with your supervisor could be insubordination.

148.    Upon information and belief, Bailey intentionally disregarded the reported conduct of Cipullo on November 4, 2014.

149.    Jiggetts then sought medical attention from the DC Superior Court's nurse due to the emotional and psychological trauma Cipullo caused her in the aforementioned meeting.

150.    On November 6, 2014, Cipullo rushed into Jiggetts' office to yell and scream at her, immediately after sending an email that was, upon information and belief, meant to harass and intimidate her.

151.    When Cipullo entered Jiggetts' office and began berating and yelling at her, she felt threatened and fearful because Cipullo was visibly agitated and this incident occurred only two (2) days after a prior similar incident.

152.    Jiggetts asked Lee to come into her office and Lee heard Jiggetts repeatedly ask Cipullo to allow her to leave her office.

153.    Jiggetts attempted to leave her office, but was unable to, due to the fact that Cipullo was standing in the doorway of her office holding the door handle.

154.    During the aforementioned encounter, Cipullo issued a Notice of Intention to Recommend a five (5) day suspension of Jiggetts.

155.    Throughout the encounter, Jiggetts asked Cipullo to move on four (4) separate occasions so that she could leave. Cipullo finally relented on the fourth request, and released the door handle, allowing Jiggetts to escape.

156.    Jiggetts called DC Superior Court security and the Metropolitan Police Department due to her fear of Cipullo.

157.    Shortly after the aforementioned encounter, Cipullo sent Jiggetts another email that was, upon information and belief, meant to harass and intimidate her. In the aforementioned Notice, Cipullo alleged gross negligence for Jiggetts' alleged failure to properly monitor halfway house placements while she was on FMLA leave, and failure to obey oral directives for her leaving the aforementioned encounter on November 6, 2014 with Cipullo.

158.    Upon information and belief, Cipullo's reasons for the suspension, gross negligence and failure to obey a directive, were pretextual, as he was attempting to bully, harass and intimidate Jiggetts, due to her being African-American.

159.    Upon information and belief, Cipullo's reasons for the suspension, specifically, gross negligence and failure to obey directive, were pretextual, as he was attempting to bully, harass and intimidate Jiggetts for speaking out about his racial discrimination and harassment of her and other African-Americans Criminal Division employees.

160.    Due to the incident on November 6, 2014, Jiggetts sought and received medical attention, and was unable to report to work from November 10 to November 17, 2014.

161.    When Jiggetts returned to work on November 17, 2014, Parris and Martinez-Vega entered Jiggetts' office, and Parris threw a letter on Jiggetts' desk and instructed her to read it.

162.    The aforementioned letter was from Bailey informing Jiggetts that she was being placed on administrative leave until further notice.

163.    Parris then informed Jiggetts that she had to leave immediately, and she frantically began to attempt to gather her personal belongings.

164.    As Jiggetts reached for her purse, Parris forcefully grabbed Jiggetts by her arm, twisted it behind her back, and threw her into a wall, injuring Jiggetts, and then forcefully escorted her out of the courthouse into the parking garage. Martinez-Vega followed with Parris.

165.    During the entire encounter, Jiggetts was fearful, and experienced severe psychological and emotional distress as a result of Parris' actions and the DC Superior Court's failure to hold other employees accountable for harassment of African-Americans.

166.    During the entire incident involving Parris' use of force against Jiggetts, Martinez-Vega was present and neither did nor said anything to stop, intervene or get help.

167.    Upon information and belief, Bailey and Cipullo sent Parris with the intent that he would intimidate and instill fear in Jiggetts when serving her the letter notifying her that she was being placed on administrative leave.

168.    On November 17, 2014, Parris intended to cause Jiggetts severe emotional distress in order to harass and intimidate her. As a direct and proximate result of Parris' conduct, Jiggetts suffered severe emotional and psychological distress.

169.    As a direct and proximate result of Parris' aforementioned actions, Jiggetts feared for her own safety due to, including but not limited to, the racial harassment she was subjected to and DC Superior Court's decisions to not take any disciplinary, corrective or remedial actions regarding the racial harassment.

170.    Upon information and belief, Jiggetts was placed on administrative leave because she was an African-American and had spoken out about racial harassment and discrimination at the DC Superior Court.

171.    On December 2, 2014, Jiggetts sent a letter contesting Cipullo's aforementioned recommendation for a five (5) day suspension, including a rebuttal of the allegations Cipullo made.

172.    Upon information and belief, Cipullo then requested that his Deputy Director, Martinez-Vega, change the five (5) day suspension recommendation into a recommendation for termination of employment.

173.    On December 23, 2014, Jiggetts received a recommendation for termination of employment from Martinez-Vega, alleging gross negligence and insubordination.

174.    On January 26, 2015, Jiggetts sent a letter contesting the aforementioned recommendation for termination of employment.

175.    On March 19, 2015, Bailey sent Jiggetts a notification that her employment was terminated.

176.    On April 6, 2015, Jiggetts properly appealed the decision to terminate her employment and requested a hearing on the matter.

177.    Wicks, the DC Superior Court Executive Officer, intentionally ignored Jiggetts' appeal and request for a hearing.

178.    In 2014, Jiggetts' assistant, Lee, was assigned to monitor halfway house placements and maintain a halfway house log. Despite the fact that this employee failed to properly monitor and update the log, she was neither disciplined and nor was any corrective action was taken.

179.    One of the reasons proffered for Jiggetts' termination was her failure to properly maintain and monitor the same aforementioned halfway house log.

180.    Subsequent to Jiggetts being terminated, the aforementioned halfway house placements and halfway house log have not been properly maintained by her replacement, who is an Asian-American. Despite the fact that this employee has failed to properly monitor and update the log, she has not been disciplined and no corrective action has been taken against her.

181.    Jiggetts sought counseling and treatment for the psychological and emotional trauma and distress that she suffered as a result of the harassment she was subjected to at the DC Superior Court.

## FACTS: KAREN COOPER

182.    On or about July 2004, Cooper commenced employment with the DC Superior Court Criminal division.

183.    From 2006 until April 27, 2015, Cooper was a supervisor in the Criminal Division Special Proceedings Branch, with a salary grade of GS-12.

184.     Cooper was paid significantly less than Caucasian employees with the same or similar positions, including but not limited to, McKinney, who was a Caucasian employee who was less qualified than Cooper.

185.     Cipullo was Cooper's supervisor during her tenure at the Criminal Division Special Proceedings Branch.

186.     During Cooper's tenure at the Special Proceedings Branch, Cipullo, Martinez-Vega and McKinney frequently and intentionally excluded Cooper from meetings and withheld information that was relevant and material to her duties.

187.     In September 2011, Cipullo told Cooper that she was "damaged", and therefore would not benefit from coaching or training.

188.     Upon information and belief, Cipullo made the aforementioned statement due solely to Cooper's race, and as a way to harass her.

189.     In April 2014, McKinney became the Special Proceedings Branch Chief and Cooper's supervisor.

190.     Throughout her tenure as a Branch Chief, McKinney was constantly and openly critical of attire that African-American females wore to work, solely due to their race.

191.     Throughout her tenure as a Branch Chief, McKinney repeatedly and openly made derogatory remarks about African-American female employees, and told racially insensitive and derogatory jokes about African-Americans.

192.     Throughout her tenure as a Branch Chief, McKinney would intentionally ignore and treat African-American females in a condescending manner. McKinney intentionally and openly treated Caucasian and other non African-American employees more favorably than African-American employees.

193.    McKinney intentionally treated African-American female employees less favorably than employees of other races solely on the basis of their race.

194.    McKinney's disparate treatment of African-American female employees, including Cooper, negatively affected their terms of employment, through including but not limited to, impacting the quality of their work, impacting their ability to transfer or be promoted, and impacting their performance reviews.

195.    Numerous reports were made to Cipullo and other managers regarding McKinney's racial harassment and discrimination of female African-American employees, but upon information and belief, no corrective, disciplinary or remedial action was taken.

196.    On or about June 27, 2013, during a monthly manager's staff meeting, Cipullo announced that the position of Special Proceedings Branch Chief was vacant.

197.    Cipullo fabricated a scheme to manipulate the selection of the new Special Proceedings Branch Chief.

198.    Based on the scheme formulated by Cipullo, a Caucasian employee was promoted to fill the Special Proceedings Branch Chief position.

199.    In July 2013, two weeks after the aforementioned meeting, Cipullo announced in a manager's staff meeting that he was appointing Alicia Shepard, who was the current Branch Chief of the Quality Assurance Branch, to the Special Proceedings Branch Chief position.

200.    In the aforementioned July 2013 meeting, Cipullo announced that he would be promoting a Caucasian male, who was less qualified than Cooper and the same salary grade as Cooper, to the Quality Assurance Branch Chief position.

201.    Cooper, and other African-American employees, were not afforded an opportunity to apply for the Quality Assurance Branch Chief position.

202.    Cipullo intentionally made the aforementioned personnel changes in order to ensure that a Caucasian male was appointed to the Quality Assurance Branch Chief position, and to prevent Cooper and other African-American employees from being promoted.

203.    Cipullo told Cooper that he made the aforementioned personnel changes so that Cooper and another African-American applicant would not have an "unfair advantage" to become the Special Proceedings Branch Chief.

204.    Cooper made complaints regarding the aforementioned personnel changes, due to Cipullo's blatant discriminatory actions.

205.    When Cipullo learned of the aforementioned complaints, he accused Cooper of gossiping and threatened to take corrective action if she did not stop telling employees that he promoted a Caucasian male over African-American females.

206.    In August 2013, Cooper filed an internal grievance against Cipullo and Martinez-Vega for, including but not limited to, bullying, racial discrimination and harassment, and reported that these actions were having a detrimental impact on her health.

207.    Due to the harassment and work environment Cooper was subjected to, she experienced elevated blood pressure, pain in her stomach, exhaustion and severe neck and shoulder pain.

208.    On February 6, 2014, DC Superior Court found that Cipullo had not engaged in any offensive or abusive conduct towards Cooper.

209.    Cooper was not advised of the aforementioned finding, and was not provided with any record or response to her aforementioned complaint.

210.    On May 12, 2014, Cooper sent an email to Nancy Griffin and Delaney, requesting a follow-up to her aforementioned complaint filed in August 2013.

211.    On May 13, 2014, Delaney forwarded the aforementioned email to Cipullo and directed him to "not take any action or engage in any discussions with Ms. Cooper." Cipullo forwarded the email to Wicks, who simply replied "Good grief!!"

212.    On June 24, 2014, Cooper sought to attend a Project Management Professional Certification class in response to negative comments by McKinney regarding Cooper's supervisory skills. McKinney denied Cooper the ability to attend the class.

213.    Cooper later requested permission to complete a related on-line certification class, and McKinney ignored the request.

214.    On June 25, 2014, Cooper filed an EEOC Charge of Discrimination for the racial harassment and discrimination, including disparate treatment and a hostile work environment, towards her and other African-Americans at the DC Superior Court, and retaliation for her filing of an internal EEO complaint.

215.    Cooper worked an alternative work schedule similar to Jiggetts and most other DC Superior Court employees with a CDO every other Friday.

216.    On September 15, 2014, Carr, who replaced McKinney, abolished Cooper's CDOs.

217.    Upon information and belief, Carr abolished Cooper's CDOs solely due to Cooper's race, and in response to Cooper's filing of an EEOC Complaint.

218.    Upon information and belief, there was no operational need for abolishing Cooper's CDOs.

219.    Cooper, and other African-American employees, had their CDOs abolished, for no legitimate non-discriminatory reason, while employees of other races were able to keep their CDOs.

220.    In March 2015, Martinez-Vega informed a DC Superior Court employee of a collaborative plan by Criminal Division managers to terminate Cooper's employment. The employee reported this to both Cooper and Bailey.

221.    Bailey intentionally ignored the aforementioned report, and took no corrective, disciplinary or remedial measures.

222.    Cooper's performance plan for July 2014 to December 2014 was submitted to her on November 21, 2014, which was five (5) months into the six (6) month rating period. Cooper should have received her aforementioned performance plan no later than thirty (30) days prior to the commencement of the rating period.

223.    Cooper's performance plan was intentionally submitted to her late in order to develop a pretextual reason to terminate her employment. Upon information and belief, this was done solely on the basis of Cooper's race, and in response to her reports of racial discrimination and harassment.

224.    On March 13, 2015, Cooper received her performance evaluation for the July to December rating period, which was two (2) months late.

225.    Cooper's aforementioned performance evaluation misrepresented and understated her performance for the July to December 2014 period.

226.    After receiving the aforementioned performance evaluation, Cooper met with Bailey to discuss her concerns regarding the low performance evaluation, late performance plan, and the effort by Criminal Division managerial personnel to terminate Cooper's employment.

227.    Bailey took no corrective, disciplinary or remedial actions to address the concerns Cooper raised in the aforementioned meeting.

228.    Cooper was placed on an Employee Improvement Plan ("EIP"), effective April 2, 2015 until August 10, 2015. Pursuant to the EIP, if Cooper failed to meet the expectations set forth in the EIP by August 10, 2015, she would be terminated.

229.    Cipullo, Carr and Martinez-Vega conspired to intentionally give Cooper low performance evaluation scores, which did not accurately reflect Cooper's performance, in order to develop a pretextual reason to terminate her employment.

230.    On April 8, 2015, Cooper submitted an appeal/grievance for the implementation of her EIP to Carr, and requested nullification of her performance rating and a new performance evaluation be completed.

231.    Carr intentionally ignored Cooper's aforementioned appeal/grievance.

232.    On April 9, 2015, Cooper applied for FMLA leave, which was subsequently granted.

233.    Cooper applied for the aforementioned FMLA leave due to the physical and emotional effects of the racial harassment she was subjected to at the DC Superior Court.

234.    On April 10, 2015, while Cooper was on FMLA leave, Carr issued a Letter of Warning to Cooper.

235.    On April 20, 2015, Cooper sent Cipullo a letter informing him that she had submitted an appeal/grievance for her EIP on April 8, 2015, and had yet to receive a response within the requisite five (5) day period. Upon information and belief, Cipullo ignored the aforementioned letter.

236.    On April 22, 2015, Carr sent a letter to Cooper informing her that she had affirmed the EIP.

237.     On April 24, 2015, Cooper sent Carr a letter in response to the Letter of Warning responding to and rebutting all allegations contained in the Letter of Warning, indicated that the language used in the Letter of Warning was negative, demeaning, and a form of harassment and bullying. Cooper copied Cipullo and Gloria Trotman ("Trotman"), the Human Resources Director in her response.

238.     While Cooper was on FMLA leave, she sought and received medical treatment for work related stress and the physical and emotional effects of the work conditions she was exposed to at the DC Superior Court.

239.     While Cooper was on FMLA leave, on April 25, 2015, Carr sent Cooper an email stating that Cooper had not provided Carr with information related to monitoring the employees Cooper supervised. Cooper had previously provided Carr with the information she sought.

240.     When Cooper attempted to return to work on April 27, 2015, she immediately felt seriously physically ill.

241.     Due to the constant, open and pervasive racial harassment Cooper, and other African-Americans, were exposed to at the DC Superior Court, and the Court's decision to take no corrective, disciplinary or remedial action after numerous reports from a variety of individuals alleging racial discrimination and harassment, Cooper was constructively discharged from her employment at the DC Superior Court.

242.     The custom and policy at the DC Superior Court of permitting and supporting racial harassment and discrimination was too much for Cooper to endure, and was not only negatively affecting the material terms of her employment, it was having a significant detrimental impact on her health as well.

243.    Cooper has suffered and continues to suffer from severe psychological and emotional trauma and distress due to the racial discrimination and harassment she was subjected to at the DC Superior Court.

## COUNT I: VIOLATION OF JIGGETTS' FIRST AMENDMENT RIGHTS PURSUANT TO 42 U.S.C. §1983 AGAINST: WICKS, BAILEY, CIPULLO, MARTINEZ-VEGA

244.    The plaintiffs incorporate by reference paragraphs 1 through 245 as if fully set forth herein.

245.    At all relevant times herein, Wicks, Bailey, Cipullo and Martinez-Vega were state actors acting under the color of state law.

246.    At all relevant times herein, Jiggetts had a clearly established right to the freedom of speech under the First Amendment to the United States Constitution.

247.    Jiggetts exercised her First Amendment right through internal and external complaints regarding racial discrimination and harassment targeted at African-American employees of the DC Superior Court.

248.    When Jiggetts filed internal and external complaints regarding racial discrimination and harassment of African-American employees of the DC Superior Court she was acting as a citizen, and not an employee, because this speech was not within the scope of her employment or part of an official duty that she was actually expected to perform.

249.    Jiggetts' speech in her internal and external complaints regarding racial discrimination and harassment targeted at African-American employees of the DC Superior Court was on a matter of public concern, as the judicial branch of government must be objective, free of bias and operating in a manner that is consistent with the Constitution of the United States.

250.    Jiggetts' aforementioned speech was on a matter of public concern because it related to political and social concerns of the community, specifically race relations and racial equality.

251.    Jiggetts' aforementioned speech was a substantial or motivating factor in the retaliatory and punitive actions taken by Cipullo, Martinez-Vega, Bailey and Wicks against Jiggetts, including but not limited to, what is described in paragraphs 115 through 182, which deprived Jiggetts' of her First Amendment rights.

252.    Jiggetts' aforementioned speech was a substantial or motivating factor in the termination of her employment, which involved actions by Cipullo, Martinez-Vega, Bailey and Wicks to obtain Jiggetts' termination.

253.    The governmental interest in promoting the efficiency of the public services performed through DC Superior Court employees does not outweigh Jiggetts' interests as a citizen in commenting upon matters of public concern, as Jiggetts' interest in raising awareness of severe racial discrimination and harassment at the DC Superior Court is significant, and the efficiency of the court system is not served by suppressing this type of speech.

254.    The acts and omissions of Cipullo, Wicks, Bailey and Martinez-Vega were intentional and wrongful, and exhibited malice and a wanton disregard for Jiggetts and other DC Superior Court employee's rights, warranting punitive damages.

**COUNT II: VIOLATION OF COOPER'S FIRST AMENDMENT RIGHTS PURSUANT TO 42 U.S.C. §1983**
**AGAINST: WICKS, BAILEY, CIPULLO, MARTINEZ-VEGA, CARR, MCKINNEY**

255.    The plaintiffs incorporate by reference paragraphs 1 through 256 as if fully set forth herein.

256.    At all relevant times herein, Wicks, Bailey, Cipullo, Martinez-Vega, Carr and McKinney were state actors acting under the color of state law.

257.    At all relevant times herein, Cooper had a clearly established right to the freedom of speech under the First Amendment to the United States Constitution.

258.    Cooper exercised her First Amendment right through internal and external complaints regarding racial discrimination and harassment targeted at African-American employees of the DC Superior Court.

259.    When Cooper filed internal and external complaints regarding racial discrimination and harassment of African-American employees of the DC Superior Court she was acting as a citizen, and not an employee, because this speech was not within the scope of her employment or part of an official duty that she was actually expected to perform.

260.    Cooper's speech in her internal and external complaints regarding racial discrimination and harassment targeted at African-American employees of the DC Superior Court was on a matter of public concern, as the judicial branch of government must be objective, free of bias and operating in a manner that is consistent with the Constitution of the United States.

261.    Cooper's aforementioned speech was on a matter of public concern because it related to political and social concerns of the community, specifically race relations and racial equality.

262.    Cooper's aforementioned speech was a substantial or motivating factor in the retaliatory and punitive actions taken by Carr, McKinney, Cipullo, Martinez-Vega, Bailey and Wicks against Jiggetts, including but not limited to, what is described in paragraphs 206 through 243, which deprived Cooper of her First Amendment rights.

263.    The governmental interest in promoting the efficiency of the public services performed through DC Superior Court employees does not outweigh Cooper's interests as a citizen in commenting upon matters of public concern, as Cooper's interest in raising awareness of severe racial discrimination and harassment at the DC Superior Court is significant, and the efficiency of the court system is not served by suppressing this type of speech.

264.    The acts and omissions of Cipullo, Wicks, Bailey, Martinez-Vega, McKinney and Carr were intentional and wrongful, and exhibited malice and a wanton disregard for Cooper and other DC Superior Court employee's rights, warranting punitive damages.

## COUNT III: VIOLATION OF JIGGETTS' FIFTH AMENDMENT RIGHT TO EQUAL PRTECTION PURSUANT TO 42 U.S.C. §1983 AGAINST: CIPULLO, WICKS, BAILEY, MARTINEZ-VEGA

265.    The plaintiffs incorporate paragraphs 1 through 266 as if fully set forth herein.

266.    At all relevant times herein, Cipullo, Wicks, Bailey and Martinez-Vega were state actors acting under the color of state law.

267.    At all relevant times herein, Jiggetts had a clearly established Fifth Amendment right to Equal Protection, which includes the right to be free from discrimination and harassment on the basis of her race.

268.    Jiggetts' race was the motivating factor in all of the intentional acts and omissions of Cipullo, Wicks, Bailey and Martinez-Vega, including but not limited to, Jiggetts' compensation, performance reviews, transfer and promotion opportunities, work assignments, disciplinary measures against Jiggetts, and Jiggetts' termination.

269.    Non African-American employees who were similarly situated to Jiggetts were treated more favorably than her, with regards to Jiggetts' compensation, performance reviews,

transfer and promotion opportunities, as described by including but not limited to, paragraphs 83 through 85 and 99 through 111.

270.    Non African-American employees who were similarly situated to Jiggetts were treated more favorably than her with regards to and work assignments and disciplinary measures, as described by including but not limited to, paragraphs 135 through 149 and 180 through 182. The aforementioned disparate treatment was solely on the basis of race and deprived Jiggetts' of her Fifth Amendment right to Equal Protection.

271.    Cipullo, Martinez-Vega, Wicks, Bailey harassed and bullied Jiggetts' through, including but not limited to, the actions described in paragraphs 115 through 182. The aforementioned harassment deprived Jiggetts' of her Fifth Amendment right to Equal Protection.

272.    The racially motivated harassment Jiggetts' was exposed to caused her damage, including but not limited to, psychological and emotional damage, and negatively impacted her work productivity.

273.    The racially motivated harassment Jiggetts' was exposed to negatively impacted the terms and conditions of her employment.

274.    The acts and omissions of Cipullo, Wicks, Bailey and Martinez-Vega were intentional and wrongful, and exhibited malice and a wanton disregard for Jiggetts and other DC Superior Court employee's rights, warranting punitive damages.

### COUNT IV: VIOLATION OF COOPER'S FIFTH AMENDMENT RIGHT TO EQUAL PRTECTION PURSUANT TO 42 U.S.C. §1983 AGAINST: CIPULLO, WICKS, BAILEY, MARTINEZ-VEGA, CARR, MCKINNEY

275.    The plaintiffs incorporate paragraphs 1 through 276  as if fully set forth herein.

276.    At all relevant times herein, Cipullo, Wicks, Bailey, Martinez-Vega, McKinney and Carr were state actors acting under the color of state law.

277.    At all relevant times herein, Cooper had a clearly established Fifth Amendment right to Equal Protection, which includes the right to be free from discrimination and harassment on the basis of her race.

278.    Cooper's race was the motivating factor in all of the intentional acts and omissions of Cipullo, Wicks, Bailey, Martinez-Vega, McKinney and Carr, including but not limited to, Cooper's compensation, performance reviews, and transfer and promotion opportunities.

279.    Non African-American employees who were similarly situated to Cooper were treated more favorably than her, with regards to Cooper's compensation, performance reviews, transfer and promotion opportunities, as described by including but not limited to, paragraphs 186 through 190, 201 through 205, 214 and 215. The aforementioned disparate treatment was solely on the basis of race, and deprived Cooper of her Fifth Amendment right to Equal Protection.

280.    Cipullo, Martinez-Vega, Wicks, Bailey, McKinney and Carr harassed and bullied Cooper through, including but not limited to, the actions described in paragraphs 193 through 208, 214 through 215, 217 through 221, 223 through 243. The aforementioned harassment deprived Cooper of her Fifth Amendment right to Equal Protection.

281.    The racially motivated harassment Cooper was exposed to caused her damage, including but not limited to, psychological and emotional damage.

282.     The racially motivated harassment Cooper was exposed to negatively impacted the terms and conditions of her employment, ultimately forcing her to resign.

283.    The acts and omissions of Cipullo, Wicks, Bailey, Martinez-Vega, McKinney and Carr were intentional and wrongful, and exhibited malice and a wanton disregard for Cooper and other DC Superior Court employee's rights, warranting punitive damages.

## COUNT V: VIOLATION OF JIGGETTS' FOURTH AMENDMENT RIGHT
## PURSUANT TO 42 U.S.C. §1983
## AGAINST: CIPULLO

284.     The plaintiffs incorporate paragraphs 1 through 285 as if fully set forth herein.

285.     At all relevant times herein, Cipullo was a state actor acting under the color of state law.

286.     At all relevant times herein, Jiggetts had a clearly established Fourth Amendment right to be free from unreasonable seizure.

287.     On November 6, 2014, Cipullo unreasonably seized Jiggetts by detaining her in her office, as described in paragraphs 151 through 155, and deprived Jiggetts of her Fourth Amendment rights.

288.     Cipullo had neither probable cause nor reasonable or articulable suspicion to believe that Jiggetts had engaged in or was about to engage in any activity to warrant detaining and/or seizing her.

289.     At all relevant times herein, Jiggetts had not engaged in and was not about to engage in any illegal activity.

290.     As a direct and proximate result of Cipullo's illegal seizure, Jiggetts was harmed, including but not limited to, by suffering extreme emotional and psychological distress, as she feared for her life and safety.

291.     Cipullo's outrageous, intentional and wrongful acts exhibited malice and a wanton disregard for Jiggetts' rights, warranting punitive damages.

## COUNT VI: VIOLATION OF JIGGETTS' FOURTH AMENDMENT RIGHT
## PURSUANT TO 42 U.S.C. §1983
## AGAINST: PARRIS

292.    The plaintiffs incorporate by reference paragraphs 1 through 293 as if fully set forth herein.

293.    At all relevant times herein, Parris was a state actor acting under the color of state law.

294.    At all relevant times herein, Jiggetts had a clearly established Fourth Amendment right to be free from unreasonable seizure and excessive force.

295.    On November 17, 2014, Parris unreasonably seized Jiggetts, and used excessive force in detaining her, as described in paragraphs 165 through 171, and deprived Jiggetts of her Fourth Amendment rights.

296.    Parris had neither probable cause nor reasonable or articulable suspicion to believe that Jiggetts had engaged in or was about to engage in any activity to warrant detaining and/or seizing her.

297.    At all relevant times herein, Jiggetts had not engaged in and was not about to engage in any illegal activity.

298.    As a direct and proximate result of Parris' illegal seizure and excessive force, Jiggetts was harmed, including but not limited to, by suffering extreme emotional and psychological distress, as she feared for her life and safety, and physical harm to her body.

299.    Parris' outrageous, intentional and wrongful acts exhibited malice and a wanton disregard for Jiggetts' rights, warranting punitive damages.

## COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## JIGGETTS AGAINST PARRIS AND THE DISTRICT OF COLUMBIA

300.    The plaintiffs incorporate by reference paragraphs 1 through 301 as if fully set forth herein.

301.    At all relevant times herein, Parris acted within the course and scope of his employment as an employee of the District of Columbia.

302.    Parris intentionally acted in an extreme and outrageous manner during his encounter with Jiggetts on November 17, 2014, as described in paragraphs 165 through 171.

303.    Parris intended to cause Jiggetts severe emotional distress through his actions on November 17, 2014.

304.    As a direct and proximate result of Parris' intentional actions on November 17, 2014, Jiggetts suffered severe emotional distress.

305.    The District of Columbia is liable for the acts and omissions of Parris as set forth herein.

## COUNT VIII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## JIGGETTS AGAINST PARRIS AND THE DISTRICT OF COLUMBIA

306.    The plaintiffs incorporate by reference paragraphs 1 through 307 as if fully set forth herein.

307.    At all relevant times herein, Parris acted within the course and scope of his employment as an employee of the District of Columbia.

308.    Defendant District of Columbia, through the acts and omissions of Parris on November 17, 2014, placed Jiggetts in danger of physical injury.

309.    As a direct and proximate result of the acts and omissions of Parris on November 17, 2014, Jiggetts feared for her own safety.

310.    As a direct and proximate result of the acts and omissions of Parris on November 17, 2014, Jiggetts suffered severe emotional and psychological distress and physical bodily harm.

311.    The District of Columbia is liable for the acts and omissions of Parris as set forth herein.

## COUNT IX: NEGLIGENCE
## JIGGETTS AGAINST PARRIS AND THE DISTRICT OF COLUMBIA

312.    The plaintiffs incorporate by reference paragraphs 1 through 313 as if fully set forth herein.

313.    At all relevant times herein, Parris acted within the course and scope of his employment as an employee of the District of Columbia.

314.    Parris had a duty to execute his duties as the DC Superior Court Chief Security Officer in a reasonably careful and prudent manner.

315.    Parris had a duty to abstain from unreasonably seizing individuals in the DC Superior Court.

316.    Parris had a duty to abstain from using excessive force in executing his duties to maintain the safety of individuals in the DC Superior Court.

317.    Parris owed the aforementioned duties to Jiggetts at all relevant times herein.

318.    On November 17, 2014, Parris breached the aforementioned duties to Jiggetts, as described in paragraphs 165 through 171.

319.    As a direct and proximate result of Parris' breach of his aforementioned duties, Jiggetts was harmed by, including but not limited to, being caused psychological, emotional and physical harm.

320.    The District of Columbia is liable for the acts and omissions of Parris as set forth herein.

**COUNT X: 42 U.S.C. §1983 *MONELL* CLAIM FOR VIOLATION OF
JIGGETTS' AND COOPER'S FIRST AND FIFTH AMENDMENT RIGHTS
AGAINST THE DISTRICT OF COLUMBIA**

321.    The plaintiffs incorporate by reference paragraphs 1 through 322 as if fully set forth herein.

322.    At all relevant times herein, Cipullo, Wicks, Bailey, Martinez-Vega, McKinney, Carr and Parris were acting under the color of state law and within the scope of their employment.

323.    At all relevant times herein, Cipullo, Wicks, Bailey, Martinez-Vega, McKinney, Carr and Parris acted pursuant to the authority vested to them by the District of Columbia and in accordance with the customs and policies of the DC Superior Court.

324.    At all relevant times herein, the DC Superior Court, and its agents, including but not limited to, Cipullo, Wicks, Bailey, Martinez-Vega, McKinney, Carr and Parris, had final policymaking authority of the District of Columbia.

325.    At all relevant times herein, the DC Superior Court had a custom, policy and practice of intentionally discriminating against African-American employees by treating them differently than similarly situated non African-American employees.  The motivating factor for this different treatment was the African-American employees' race.

326.    At all relevant times herein, the aforementioned custom, policy and practice of the DC Superior Court applied to employment benefits, promotion and transfer opportunities, and performance evaluations, as described in, including but not limited to, paragraphs  through paragraphs 12, 14, 25, 85 through 87, 99 through 109, 186, 203 through 206 and 230 through 233.

327.    At all relevant times herein, the aforementioned custom, policy and practice of the DC Superior Court applied to disciplinary and corrective actions, as described in, including but not limited to paragraphs 30 through 76, 145 through 149, 176 through 182 and 222 through 233.

328.     At all relevant times herein, the aforementioned custom, policy and practice of the DC Superior Court included harassment and retaliation on the basis of the race of African-American employees, as described in, including but not limited to**,** paragraphs 7 through 14, 120 through 182,  188 through 241.

329.     At all relevant times herein, the aforementioned custom, policy and practice of the DC Superior Court applied to work assignments, as described in, including but not limited to, paragraphs 135 through 139.

330.     The aforementioned custom, policy and practice of the DC Superior Court of intentionally discriminating against African-American employees by treating them differently than similarly situated non African-American employees was knowingly condoned by numerous executive officials and managerial personnel with final policymaking authority.

331.     The aforementioned custom, policy and practice of the DC Superior Court of intentionally discriminating against African-American employees by treating them differently than similarly situated non African-American employees deprived Jiggetts and Cooper of their Fifth Amendment Right to Equal Protection and caused them damage.

332.     At all relevant times herein, the DC Superior Court had a custom, policy and practice of retaliating against employees who exercised their First Amendment Right to Freedom of Speech through reports, complaints and statements regarding racial harassment and discrimination of African-American employees at the DC Superior Court, as described in, including but not limited to, paragraphs 115 through 182 and 197 through 208 and 212 through 244. The motivating factor for this policy was the African-American employees' race.

333.     When all of the speech mentioned herein was made, the employees were acting as a citizen, and not employees, because this speech was not within the scope of their employment or part of an official duty that they were actually expected to perform.

334.     All of the speech mentioned here was on a matter of public concern, as the judicial branch of government must be objective, free of bias and operating in a manner that is consistent with the Constitution of the United States.

335.     All of the speech mentioned herein was on a matter of public concern because it related to political and social concerns of the community, specifically race relations and racial equality.

336.     All of the speech mentioned herein was a substantial or motivating factor in the retaliatory and punitive actions mentioned herein.

337.     The governmental interest in promoting the efficiency of the public services performed through DC Superior Court employees does not outweigh the interests of those employees, as citizens commenting upon matters of public concern, as the employees' interest in raising awareness of severe racial discrimination and harassment at the DC Superior Court is significant, and the efficiency of the court system is not served by suppressing this type of speech.

338.     The aforementioned custom, policy and practice of the DC Superior Court was knowingly condoned by numerous executive officials and managerial personnel with final policymaking authority.

339.     The aforementioned custom, policy and practice of the DC Superior Court deprived Jiggetts and Cooper of their First Amendment Right to Freedom of Speech and caused them damage.

340.     Defendant District of Columbia is liable for the violation of Jiggetts' and Cooper's First and Fifth Amendment rights that resulted from the unconstitutional customs, policies and practices alleged herein.

### COUNT XI: VIOLATION OF JIGGETTS' RIGHTS PURSUANT TO 29 U.S.C. §2601, *et. seq.*, INTERFERENCE-EXERCISE OF RIGHTS AGAINST THE DISTRICT OF COLUMBIA

341.     The plaintiffs incorporate by reference paragraphs 1 through 342 as if fully set forth herein.

342.     Jiggetts was eligible to apply for and receive FMLA leave pursuant to 29 U.S.C. §2601, *et. seq.*

343.     At the time that Jiggetts applied for FMLA leave, she had been a DC Superior Court employee for more than twelve months.

344.     Jiggetts as described herein provided the required notification of her FMLA leave, and was entitled to and granted FMLA leave.

345.     Jiggetts was engaged in statutory protected conduct when she applied for and was granted leave pursuant to FMLA.

346.     At all relevant times herein, Cipullo and Martinez-Vega were acting within the scope of their employment.

347.     Cipullo and Martinez-Vega, as described in, including but not limited to, paragraphs 119 through 126, intentionally interfered with Jiggetts' FMLA leave, and intentionally retaliated against Jiggetts' for taking FMLA leave, which culminated into a termination of Jiggetts' employment.

348.     Cipullo and Martinez-Vega's intentional actions and conduct as alleged herein, while Jiggetts was on FMLA leave, denied her the full benefit of the leave.

349.    Cipullo and Martinez-Vega intentionally did not fulfill their statutory obligation to Jiggetts under FMLA.

350.    Defendant District of Columbia had actual and constructive notice that Cipullo and Martinez-Vega interfered with Jiggetts' FMLA leave, but intentionally chose to abstain from taking any corrective or remedial action.

351.    Defendant District of Columbia is liable for the violations of Jiggetts' FMLA rights and for interfering with those rights, and for the damages caused to Jiggetts as a result of these violations.

352.    Defendant District of Columbia did not act in good faith as to any FMLA violations alleged herein, and the violations were intentional.

### COUNT XII: VIOLATION OF COOPER'S RIGHTS PURSUANT TO 29 U.S.C. §2601, *et. seq.*, INTERFERENCE-EXERCISE OF RIGHTS AGAINST THE DISTRICT OF COLUMBIA

353.    The plaintiffs incorporate by reference paragraphs 1 through 354 as if fully set forth herein.

354.    Cooper was eligible to apply for and receive FMLA leave pursuant to 29 U.S.C. §2601, *et. seq.*

355.    At the time that Cooper applied for FMLA leave, she had been a DC Superior Court employee for more than twelve months.

356.    Cooper as described herein provided the required notification of her FMLA leave, and was entitled to and granted FMLA leave.

357.    Cooper was engaged in statutory protected conduct when she applied for and was granted leave pursuant to FMLA.

358.    At all relevant times herein, Carr was acting within the scope of her employment.

359.    Carr, as described in, including but not limited to, paragraphs 234 through 243, intentionally interfered with Cooper's FMLA leave, and intentionally retaliated against Cooper for taking FMLA leave.

360.    Carr's intentional actions and conduct as alleged herein, while Cooper was on FMLA leave, denied her the full benefit of the leave.

361.    Carr intentionally did not fulfill her statutory obligation to Cooper under FMLA.

362.    Defendant District of Columbia had actual and constructive notice Carr interfered with Cooper's FMLA leave, but intentionally chose to abstain from taking any corrective or remedial action.

363.    Defendant District of Columbia is liable for the violations of Cooper's FMLA rights and for interfering with those rights, and for the damages caused to Cooper as a result of these violations.

364.    Defendant District of Columbia did not act in good faith as to any FMLA violations alleged herein, and the violations were intentional.

## **PRAYER FOR RELIEF**

WHEREFORE, the plaintiff Jiggetts demands judgment against all defendants as follows:

I.      Re-pleads and re-alleges paragraphs 1 through 366 with the same force and effect as if fully set forth herein;

II.     Subject to further discovery, reserves the right to amend the Complaint;

III.    That the defendants be ordered to take appropriate and affirmative acts to ensure that the acts complained of herein are not engaged in again by the defendants or any of its agents;

IV.     That the defendants, including the officers, directors, agents, employees and successors be permanently enjoined from discriminating or retaliating against any person;

V.      An award in the amount of $20,000,000.00 in compensatory and $40,000,000.00 punitive damages in favor of Jiggetts for the 42 U.S.C. §1983 violations against the individual named defendants;

VI.     An award in the amount of $20,000,000.00 in compensatory damages in favor of Jiggetts for the 42 U.S.C. §1983 violations against the District of Columbia;

VII.    An award in the amount of $10,000,000.00 in compensatory damages in favor of Jiggetts for all tort claims alleged herein;

VIII.   An award in the amount of $10,000,000.00 in compensatory damages in favor of Jiggetts for the violations of her rights under 29 U.S.C. §2601, *et. seq.*

IX.     Attorney's fees, costs and prejudgment interest;

X.      Court fees and costs;

XI.     Any and all other relief that this Court deems just and fair.

WHEREFORE, the plaintiff Cooper demands judgment against all defendants as follows:

I.      Re-pleads and re-alleges paragraphs 1 through 366 with the same force and effect as if fully set forth herein;

II.     Subject to further discovery, reserves the right to amend the Complaint;

III.    That the defendants be ordered to take appropriate and affirmative acts to ensure that the acts complained of herein are not engaged in again by the defendants or any of its agents;

IV.     That the defendants, including the officers, directors, agents, employees and successors be permanently enjoined from discriminating or retaliating against any person;

V.      An award in the amount of $20,000,000.00 in compensatory and $40,000,000.00 punitive damages in favor of Cooper for the 42 U.S.C. §1983 violations against the individual named defendants;

VI.     An award in the amount of $20,000,000.00 in compensatory damages in favor of Cooper for the 42 U.S.C. §1983 violations against the District of Columbia;

VII.    An award in the amount of $10,000,000.00 in compensatory damages in favor of Cooper for the violations of her rights under 29 U.S.C. §2601, *et. seq.*

VIII.   Attorney's fees, costs and prejudgment interest;

IX.     Court fees and costs;

X.      Any and all other relief that this Court deems just and fair.

Tenisha N. Jiggetts
Karen W. Cooper
By Counsel

Respectfully submitted,

*/s/ Billy L. Ponds*
Billy L. Ponds
Counsel for the Plaintiffs
The Ponds Law Firm
Bar Number 379883
2101 L Street, N.W.
Suite 400
Washington, D.C. 20037
Telephone Number: (202) 333-2922
E-Mail: plfpc@aol.com

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **TENISHA N. JIGGETTS** | : |
| | : |
| **and** | : |
| | : **Civil Action Number:** |
| **KAREN W. COOPER** | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| **v.** | : |
| | : |
| **DANIEL W. CIPULLO,** *et. al.* | : |
| | : |
| **Defendants.** | : |

==================================

## <u>JURY DEMAND</u>

The plaintiffs hereby request a trial by jury of twelve (12) on all triable issues, including

the amount of damages to be awarded.

Tenisha N. Jiggetts
Karen W. Cooper
By Counsel

Respectfully submitted,

*/s/ Billy L. Ponds*
Billy L. Ponds
Counsel for the Plaintiffs
The Ponds Law Firm
Bar Number 379883
2101 L Street, N.W.
Suite 400
Washington, D.C. 20037
Telephone Number: (202) 333-2922
E-Mail: plfpc@aol.com
