**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TENISHA JIGGETTS, *et al.*, | |
| Plaintiffs, | Civil Action No. 17-380 (JMC) |
| v. | |
| DANIEL W. CIPULLO, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Tenisha Jiggetts and Karen Cooper, both proceeding pro se, filed suit against their employer, the District of Columbia, as well as several employees of the Superior Court for the District of Columbia, bringing various constitutional, common law, and statutory claims.[1] This Court previously dismissed some of those claims, as well as all but two of the individual Defendants who were named in the initial complaint. ECF 40. The following claims remain before the Court: both Plaintiffs' First Amendment retaliation and Fifth Amendment equal protection claims against Defendant Daniel Cipullo (Counts I–IV); both Plaintiffs' Family Medical Leave Act (FMLA) claims against the District (Counts XI–XII); Jiggetts' Fourth Amendment claim against Defendant Officer Richard Parris (Count VI); and Jiggetts' tort claims against Officer Parris and the District (Counts VII–IX). The remaining Defendants now move for summary judgment on these surviving claims. ECF 58; ECF 59.

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

For the reasons described below, the Court **GRANTS IN PART and DENIES IN PART** Defendants' motion for summary judgment as to Jiggetts. ECF 59. Genuine factual disputes preclude summary judgment as to Jiggetts' Fourth Amendment and FMLA claims, but Defendants are entitled to judgment as a matter of law on Jiggetts' First Amendment, Fifth Amendment, and tort claims. With respect to Cooper's claims, the Court **GRANTS** Defendants' motion for summary judgment, ECF 58, in its entirety. Cooper's allegations, if true, establish that she endured a difficult work environment, and for that the Court is sympathetic. But she has not identified material issues of fact such that a reasonable jury could find that any Defendant violated her constitutional or statutory rights.

## I.    BACKGROUND

The Court will first summarize the factual background for each Plaintiff, then turn to the procedural history of the case. Unless indicated otherwise, the following facts are undisputed.[2]

### A.    Tenisha Jiggetts

Tenisha Jiggetts is an African-American woman. ECF 41 ¶ 3. She began working as an Attorney Advisor in the Criminal Division of the Superior Court in 2008 and remained in that

---

[2] In light of Plaintiffs' pro se status, a few procedural issues are worth addressing at the outset. First, in her response to Defendants' Statement of Undisputed Material Facts (SUMF), Jiggetts sometimes labels a fact as "disputed," but the accompanying text makes clear she only disputes that fact in part. *See, e.g.*, ECF 62-1 ¶ 7. When that is the case, the Court deems as admitted any portion of Defendants' factual statement that Jiggetts does not specifically dispute. Second, Jiggetts sometimes represents that a fact is "disputed," but does not cite to any record evidence to demonstrate that the alleged fact is disputed. *See* ECF 62-1 ¶¶ 5, 8, 11–14, 30, 34, 40, 47–48, 55–57, 59, 60, 64. Cooper failed to submit a response to Defendants' SUMF at all, as required by Local Civil Rule 7(h)(1). *See* ECF 63; Loc. Civ. R. 7(h)(1) ("An opposition to [a summary judgment motion] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."). The Court is sensitive to the fact that Plaintiffs are proceeding pro se—particularly as to Cooper who (unlike Jiggetts) is not an attorney. *See Spence v. U.S. Dep't of Veterans Affs.*, 109 F.4th 531, 543 (D.C. Cir. 2024), *cert. denied*, No. 24-468, 2024 WL 4874689 (Nov. 25, 2024) (distinguishing between pro se plaintiffs and attorneys proceeding pro se). However, the Court instructed Plaintiffs that merely stating that a material fact is disputed is not sufficient to survive a motion for summary judgment, and that the Court may treat as conceded factual assertions that are not disputed with appropriate support. *See* ECF 60. While the Court has not combed through the entire record submitted to identify factual disputes, the Court did not ignore evidence helpful to Plaintiffs that it came across in reviewing the cited portions of the record.

position until she was terminated in April 2015. ECF 62-1 ¶ 1. During the relevant time, Jiggetts' supervisors were Defendant Daniel Cipullo (Director of the Criminal Division) and Yvonne Martinez-Vega (Deputy Director). *Id.* ¶¶ 2–3. Beginning around 2012, Jiggetts' relationship with her supervisors began to deteriorate, leading ultimately to her termination.

### 1. *New job responsibilities*

In 2012, Jiggetts' work responsibilities shifted. *Id.* ¶ 4. The parties agree that Jiggetts became responsible "for checking the status of halfway house placements." *Id.* ¶ 5. (For context: Superior Court judges might order that a detained defendant be released from D.C. jail to a halfway house placement. *See id.*) In light of her new responsibilities, Jiggetts submitted a request to Human Resources that her position be reclassified from Grade 13 to Grade 14. *Id.* ¶ 7. That request was denied. *Id.*

### 2. *FMLA leave*

In August 2014, Jiggetts submitted an FMLA leave request to accommodate her spouse's scheduled surgery. *Id.* After that request was approved, *id.* ¶ 63, she informed Cipullo and Martinez-Vega that she would take leave on August 20th, 21st, and 25th, then work half-days (from 7:00 AM to noon) from August 26th through September 16th, *id.* ¶ 65. Jiggetts avers that, while she was on part-time leave, Cipullo sent her multiple emails after she had gone home for the day, assigned her tasks that were impossible to complete within the confines of her part-time schedule, and repeatedly "berate[d]" her for failing to complete those tasks on time. ECF 59-1 at 138–40. Jiggetts also contends that Cipullo pressured her to attend a training session that took place in the afternoon—outside her FMLA work schedule. *Id.* at 138–39.

### 3. *Halfway house placements*

In August and September 2014, a defendant's transfer from D.C. Jail to a halfway house was delayed for approximately 30 days—a lapse that, according to Defendants, Jiggetts failed to

catch. *See id.* at 103–06; ECF 62-1 ¶¶ 11–13. Jiggetts purports to dispute this but does not cite any record evidence in rebuttal and acknowledges that she cannot recall what happened with this defendant. *See id.* at 103–06; ECF 62-1 ¶¶ 11–13.

On September 18, 2014, Cipullo emailed Jiggetts requesting "a copy of all the work product [she] sent out in the last two weeks concerning the e-mails or phone calls and correspondence that [she] ha[d] received." ECF 59-10 at 5–6; *see also* ECF 62-1 ¶ 16. According to Cipullo, Jiggetts did not comply with that request, as well as several similar requests that both he and Martinez-Vega made over the following weeks. *See* ECF 59-10 at 4–6; ECF 62-1 ¶¶ 15–17. Jiggetts, in response, maintains that she tried to clarify what her supervisors were asking for, but that those requests for clarification were ignored. *See* ECF 59-1 at 112–13; ECF 62-1 ¶¶ 15, 17.

### 4. *EEOC complaint*

On September 22, 2014, Jiggetts filed a formal EEOC complaint against Cipullo alleging racial discrimination and retaliation. ECF 59-24. The complaint stated that Cipullo treated Jiggetts and other African-American employees less favorably than white employees; that white employees were paid more than their African-American colleagues who performed similar work; that Cipullo gave Jiggetts unreasonable deadlines, including while she was out on FMLA leave; and that Cipullo "threatened and bullied" her, unfairly criticized her performance, and gave her a negative performance evaluation. *Id.* at 1–2.

### 5. *Martinez-Vega revokes Jiggetts' compressed day off*

On October 9, 2014, Martinez-Vega revoked Jiggetts' flexible work schedule, under which Jiggetts had been allowed to take Fridays off in exchange for working extra hours Monday through Thursday. ECF 59-6 at 1. Martinez-Vega informed Jiggetts that the reason for the decision was

that Jiggetts had failed to arrange coverage during her prior three compressed days off, and failed to come into work on one Friday on which Martinez-Vega had told her she was needed. *Id.*

### 6. *Cipullo recommends Jiggetts' suspension*

In mid-October 2014, Cipullo learned about the defendant who had been overdetained for more than 30 days. *See* ECF 62-1 ¶ 14. After some back and forth with Jiggetts, Cipullo and Martinez-Vega met with her on November 4, 2014. *See id.* ¶¶ 15, 18. The parties have different accounts of what happened at that meeting. *Id.* ¶ 18. Defendants say that Jiggetts "repeatedly refused to answer Cipullo's work-related questions and abruptly walked out the meeting and stated that the meeting was over, even after Cipullo said that the meeting was not over." *Id.*; *see* ECF 59-3 at 90; ECF 59-10 at 6–7; ECF 59-23 at 11. Jiggetts states that she "tried to answer Cipullo's questions, but he continued to yell, bang on the table, and berate her and did not allow her to finish." ECF 62-1 ¶ 18; *see* ECF 59-1 at 114. Jiggetts sent Martinez-Vega an email later that day, apologizing for "walking out" of the meeting. ECF 59-12 at 1.

Shortly after that incident, on November 6, 2014, Cipullo made a formal recommendation that Jiggetts be suspended for five days for purported negligence in the performance of her job duties and failure to obey directives. ECF 62-1 ¶ 21; *see* ECF 59-10. Jiggetts asserts that, when Cipullo served her with notice of his recommendation, he stood in the doorway of her office and refused to move as Jiggetts tried to leave, despite her repeated requests that he move out of her way. *See* ECF 62-1 ¶¶ 23–26. Jiggetts reported the incident to the police. ECF 59-1 at 118. Cipullo testified that soon after that, he recused himself from serving as Jiggetts' supervisor, and from any participation in determining what discipline she should receive. ECF 59-3 at 123–24. Jiggetts argues that Cipullo nonetheless remained involved in decisions concerning her employment. *See* ECF 62-1 ¶ 28.

5

### 7. *Confrontation with Officer Parris*

Less than two weeks later, on November 17, 2014, Martinez-Vega and Officer Richard Parris (Chief Security Officer for Superior Court) went to Jiggetts' office to inform her that she was being placed on administrative leave, effective immediately. ECF 62-1 ¶¶ 30–31. Officer Parris told Jiggetts that she was required to leave the premises. *Id.* ¶¶ 32–33. The specifics of the encounter between Jiggetts and Parris are contested.

According to Jiggetts, she asked Officer Parris if he would like her to log off of her computer and he instructed her to "log off." ECF 59-1 at 126. She logged off of her computer, changed into her sneakers, and asked Martinez-Vega if she could get a bag to carry her other shoes. *Id.* After she placed her shoes in a bag, Jiggetts grabbed another bag and turned to the locked overhead credenza to retrieve her purse. *Id.* at 127. Officer Parris then told Jiggetts that she was only allowed to take her personal belongings and that the rest of her possessions would be delivered to her per Court policy. *Id.*; *see* ECF 62-1 ¶ 34. Jiggetts said "okay" and explained that she only wanted to retrieve her purse, which was in the locked overhead credenza. ECF 59-1 at 127.

Jiggetts testified that as she reached for her purse, Officer Parris, without warning, "grabbed [her] by [her] right arm," "twisted it behind [her] back," and "pushed [her] into the wall." *Id.* at 127. Jiggetts repeatedly asked him "how dare you put your hands on me[?] There's no reason to put your hands on me." *Id.* at 128. In response, Officer Parris yelled, "I'm going to have you arrested if you don't stop." *Id.* "Arrested for what?" Jiggetts asked. *Id.* Officer Parris replied that she was "supposed to just grab [her] things and leave." *Id.*

Officer Parris characterizes the events very differently. He alleges that Jiggetts was not complying with his instructions, tried to grab items other than her purse, and slapped his hand or "brushed [him] off" as he was trying to pick up a bag that she had put on the floor. ECF 59 at 15–

16; ECF 62-1 ¶¶ 34–39. Officer Parris admits that he grabbed Jiggetts' wrists, ECF 62-1 ¶ 41, but does not admit that he twisted her arm or pushed her into a wall, *see* ECF 66 at 25.

Following that incident, Officer Parris and Martinez-Vega escorted Jiggetts out of the building. ECF 62-1 ¶ 46. Jiggetts went to her car, cried, and called the police. ECF 59-1 at 131. Jiggetts avers that she was traumatized by the incident and that her shoulder began to hurt "almost immediately" after. *Id.* at 130.

8. *Martinez-Vega recommends Jiggetts' termination*

On December 19, 2014, Martinez-Vega issued Jiggetts a formal letter recommending that Jiggetts be terminated. ECF 62-1 ¶ 48; ECF 59-17 at 15. In the letter explaining that decision, Martinez-Vega criticized Jiggetts' failure to take responsibility for her on-the-job mistakes, detailed eleven instances in which various defendants' placements in halfway houses had been delayed on her watch, and recounted several incidents of what Martinez-Vega characterized as insubordinate behavior. *See* ECF 59-17. On March 19, 2015, Acting Clerk of Court Cheryl Bailey affirmed Martinez-Vega's recommendation to terminate Jiggetts. ECF 62-1 ¶ 49; *see* ECF 59-22. Jiggetts' termination became effective on April 3, 2015. ECF 62-1 ¶ 49.

**B. Karen Cooper**

Karen Cooper, like Jiggetts, is an African-American woman. ECF 41 ¶ 4. Cooper began working in Superior Court's Criminal Division in 2004, and was employed as a supervisor in the Special Proceedings Branch from 2006 until her resignation on April 27, 2015. ECF 58 at 26 ¶¶ 1, 2. During the relevant time period, Martinez-Vega was Cooper's second-line supervisor, and Cipullo was her third-line supervisor. *Id.* at 26–27 ¶¶ 3, 4; *see also* ECF 58-2.

1. *Cooper's first-line supervisor is replaced*

In June 2013, Cooper learned that her first-line supervisor, Aaron Robinson, was leaving his post to transfer to a different division. ECF 58-4 at 14–15. Around the same time, Cipullo

announced that he had selected Quality Assurance Branch Chief Alicia Shepard, an African-American woman, to temporarily fill Robinson's position. *Id.* at 15; *see* ECF 58-1 at 20. Cipullo claims he made that decision because he did not want any employee within Cooper's division—who might apply to permanently fill the position—to have the advantage of incumbency. ECF 58-4 at 15. Cipullo then promoted Steven Murff, a white man, to fill Shepard's position. *Id.* Cooper did not ultimately apply for the permanent supervisor position, which was given to one of her co-workers in the Special Proceedings Branch, Belinda Carr (also an African-American woman). ECF 58-1 at 43. Cooper stated that she did not want the job because she "wanted a transfer" out of the division instead. *Id.*

### 2. *"Bullying Complaint"*

On August 12, 2013, Cooper filed a "Bullying Complaint" with Human Resources, alleging that Cipullo and Martinez-Vega had "bullied and harassed her" in violation of Superior Court's Personnel Policy. ECF 58-7 at 1. In an affidavit accompanying the complaint, Cooper stated that she was not alleging she was bullied because of her race (or indeed because of any protected characteristic). ECF 58-8 at 1. Rather, Cooper alleged that her managers had subjected her to a hostile work environment in violation of the Court's anti-bullying policy. *Id*. Per Cooper, Superior Court ultimately determined that Cipullo "had not engaged in any offensive or abusive conduct" toward her. ECF 58-4 at 6.

The day after she submitted her internal complaint, Cooper was called into a meeting with Cipullo, Martinez-Vega, and a Human Resources representative. *Id.* at 13. According to Cooper, Cipullo was upset that she was speaking with coworkers about how Cipullo had gone about filling Robinson's position earlier that summer, *see supra* Part I.B.1, and threatened to take "formal corrective action" if she did not stop doing so, ECF 58-4 at 13.

### 3. McKinney's appointment and Cooper's EEOC complaint

In the spring of 2014, Nancy McKinney—a white woman—was assigned to temporarily serve as Cooper's first-line supervisor. ECF 58-1 at 23, 124. Cooper argues (without citing to any sworn testimony or other evidence) that working under McKinney was "hell," and that McKinney "question[ed] everything" she did. ECF 63 at 11. On June 18, 2014, Cooper filed an EEOC Charge alleging "discrimination and hostile work environment on the basis of sex, race, and workplace retaliation." ECF 58-6 at 3–4.

### 4. Carr becomes Cooper's supervisor

After Cooper filed her EEOC Charge, Belinda Carr replaced McKinney, permanently stepping into the position of Cooper's first-line supervisor. ECF 58-4 at 17. In September 2014, although Cooper had had a compressed day off for a about a year, Carr revoked Cooper's compressed day off. ECF 58-1 at 65–66; *see* ECF 58-6 at 8 (noting that this occurred in September 2014).[3] In February or March 2015, after receiving a poor performance evaluation, Cooper was placed on an Employee Improvement Plan (EIP). ECF 58-1 at 69–70; *see* ECF 58-12 at 4.

### 5. FMLA leave and resignation

On April 10, 2015, Cooper was granted intermittent FMLA leave so that she could attend physical therapy sessions on April 14th, 21st, and 23rd. ECF 58-10; *see also* ECF 58-1 at 109–11. On April 25, 2015, Carr sent an email requesting that Cooper send her certain documents related to Cooper's monitoring of employees under her supervision. ECF 58-4 at 17; ECF 58-11. Cooper resigned from her position on April 27, 2015. ECF 58-1 at 98–99, 107.

---

[3] Cooper states in her opposition that Carr revoked her compressed day off in November 2015, ECF 63 at 8, but that would have been after Cooper resigned in April 2015.

### C. Procedural Background

On March 2, 2017, Plaintiffs filed their complaint in this case,[4] making various claims against seven individual Defendants and the District of Columbia. ECF 1. Defendants moved to dismiss. ECF 30. The Court dismissed many of Plaintiffs' claims, including all claims brought against individuals in their official capacities. *See* ECF 38; ECF 40. The surviving claims are as follows.

- Against Cipullo in his individual capacity: (1) retaliation in violation of Jiggetts' First Amendment rights; (2) retaliation in violation of Cooper's First Amendment rights; (3) violation of Jiggetts' Fifth Amendment equal protection rights; and (4) violation of Cooper's Fifth Amendment equal protection rights.

- Against Officer Parris in his individual capacity: violation of Jiggetts' Fourth Amendment rights.

- Against the District of Columbia and Officer Parris in his individual capacity: (1) intentional infliction of emotional distress; (2) negligent infliction of emotional distress; and (3) negligence, as to Jiggetts.

- Against the District of Columbia only: (1) violation of Jiggetts' FMLA rights and (2) violation of Cooper's FMLA rights.

*See* ECF 27-1 at 31–46; ECF 38.

Following discovery, Defendants filed two motions for summary judgment: one motion seeks judgment on all claims brought by Cooper, ECF 58, and the second seeks judgment on all claims brought by Jiggetts, ECF 59. The Court issued an order informing Plaintiffs of their burden under Federal Rule of Civil Procedure 56. ECF 60. In its order, the Court warned Plaintiffs that "the Court will accept as true any factual assertions contained in affidavits or attachments submitted by the defendant in support of a motion for summary judgment unless the plaintiffs

---

[4] This was not their first complaint. Two years earlier, in May 2015, Plaintiffs jointly filed a complaint making various claims against Cipullo and the District of Columbia. *See* ECF 1, *Jiggetts v. District of Columbia*, No. 15-cv-752. That case was dismissed without prejudice, *see id.*, ECF Nos. 50 & 51, and the district court's order was summarily affirmed on appeal, *Cooper v. District of Columbia*, No. 17-7021, 2017 WL 5664737 (D.C. Cir. Nov. 1, 2017).

submit affidavits or documentary evidence showing that the defendant's assertions are untrue." *See id.* (citing *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992)). Plaintiffs filed separate motions opposing summary judgment, ECF 62; ECF 63, and Defendants replied to each, ECF 65; ECF 66.

## II.    LEGAL STANDARD

The Court will grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences" in that party's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

A party that moves for summary judgment must support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, it falls to the nonmoving party to establish that a genuine dispute exists regarding a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). To do so, the nonmoving party must demonstrate that "there is sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party." *Talavera*, 638 F.3d at 308. The nonmoving party must produce more than a "scintilla of evidence" in support of its positions, *id.*, and its evidence must consist of more than mere unsupported allegations or denials, *see Celotex*, 477 U.S. at 322 & n.3. If the evidence cited by the nonmoving party is "merely colorable" or is "not significantly probative," summary judgment may be granted in favor of the moving party. *Anderson*, 477 U.S. at 249.

11

In making their arguments for or against summary judgment, both parties are responsible for pointing the Court to specific evidence in the record that supports their positions. Fed. R. Civ. P. 56(c)(1)(A); *see also Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009) ("[E]vidence laying dormant in the record is not enough."). As the D.C. Circuit has recognized, "the district court is not obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make its own analysis . . . of what may, or may not, be a genuine issue of material disputed fact." *Id*. (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)). That said, although a court is not required to consider uncited evidence, it may do so at its discretion. *See* Fed. R. Civ. P. 56(c)(3).

Because Jiggetts and Cooper are proceeding pro se, the Court will "liberally construe[]" their filings. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). And although Jiggetts is herself an attorney, the Court will exercise its discretion to treat her as it would any other pro se plaintiff. *See Spence*, 109 F.4th at 543 ("[T]he requirement to afford a liberal construction to a pro se plaintiff's pleadings does not apply to pro se attorneys. Rather, we leave such questions to the sound discretion of the district court."). But "when faced with a motion for summary judgment, even a pro se plaintiff must comply with the Federal Rules of Civil Procedure and this Court's local rules." *Hedrick v. FBI*, 216 F. Supp. 3d 84, 93 (D.D.C. 2016).

## III.    ANALYSIS

The Court will consider, in order, Plaintiffs' constitutional claims, common law claims, and statutory claims. The Court ultimately denies Defendants' motion for summary judgment as to Jiggetts' Fourth Amendment claim (Count VI) and FMLA claim (Count XI), but grants Defendants' motions as to Jiggetts' remaining claims and all of Cooper's claims.

### A. Constitutional Claims

42 U.S.C. § 1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." To prevail on a Section 1983 claim, a plaintiff must first establish a predicate violation of her constitutional rights. *Golden State Transit Corp. v. City of L.A.*, 493 U.S. 103, 106 (1989). The plaintiff must also show that the violation occurred within the applicable statute of limitations, which is determined by looking to analogous state law. *Owens v. Okure*, 488 U.S. 235, 249–50 (1989). In the District of Columbia, the statute of limitations for constitutional claims under Section 1983 is three years. *Earle v. District of Columbia*, 707 F.3d 299, 305 (D.C. Cir. 2012). Here, because the complaint was filed on March 2, 2017, any claims based on violations that occurred before March 2, 2014 are barred.[5]

Jiggetts brings three constitutional claims: against Cipullo under the First Amendment, against Cipullo under the Fifth Amendment, and against Officer Parris under the Fourth Amendment. Cooper, for her part, brings claims against Cipullo under the First and Fifth Amendments. The Court considers Plaintiffs' claims in turn.

### 1. Fifth Amendment Equal Protection

Both Jiggetts and Cooper allege that Cipullo discriminated against them on the basis of race, in violation of their Fifth Amendment equal protection rights. ECF 27-1 at 34–37. The Fifth

---

[5] That limitation may not apply to Jiggetts' hostile work environment claim. *See infra* Part III.A.1(a). In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court held that because a hostile work environment claim is not based on a discrete violation but the "cumulative effect of individual acts," a court may consider actions that would be time-barred were they litigated as discrete acts of discrimination. *Id.* at 115. The D.C. Circuit has declined to decide whether this doctrine applies to hostile work environment claims brought under Section 1983, *see Earle*, 707 F.3d at 306, but several courts in this District and beyond have found that it does, *see Motley-Ivey v. District of Columbia*, 923 F. Supp. 2d 222, 240–41 (D.D.C. 2013) (collecting cases). But even assuming that the more favorable standard laid out in *Morgan* applies, Jiggetts' hostile work environment claim cannot survive— as the Court explains *infra*.

Amendment requires the District and its employees to "treat similarly situated persons alike." *Women Prisoners of the D.C. Dep't of Corrs. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996). Where a Section 1983 plaintiff presents circumstantial evidence of racial discrimination, courts in this district apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hamilton v. District of Columbia*, 852 F. Supp. 2d 139, 146 (D.D.C. 2012) (collecting cases); *cf. Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1232 (D.C. Cir. 1984) (applying *McDonnell Douglas* to Section 1981 claim); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993) ("[W]e shall assume that the *McDonnell Douglas* framework is fully applicable to racial-discrimination-in-employment claims under 42 U.S.C. § 1983.").

First, the plaintiff must establish a prima facie discrimination claim by showing that, "(1) [s]he is a member of a protected class, (2) [s]he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that h[er] employer took the action because of h[er] membership in the protected class)." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). The burden then shifts to the employer to present a legitimate, nondiscriminatory justification for the challenged action. *McDonnell Douglas Corp.*, 411 U.S. at 802. Once the employer does so, however, the *McDonnell Douglas* framework falls away. *Figueroa v. Pompeo*, 923 F.3d 1078, 1086–87 (D.C. Cir. 2019). Instead, the court simply asks: "[h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason[,] and that the employer intentionally discriminated against the employee?" *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). To show that the employer's stated reasons were pretextual, a plaintiff may cite "the employer's better treatment of similarly situated employees outside the plaintiff's

protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or [its] poor treatment of other employees in the same protected group . . . or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). Here, the Court concludes that neither Jiggetts nor Cooper has met her burden to establish a genuine dispute as to her Fifth Amendment claim.

(a) <u>Jiggetts</u>

In her opposition, Jiggetts argues that Cipullo discriminated against her by (1) denying her request to reclassify her position to Grade 14, (2) recommending that she be suspended, (3) terminating her, and (4) creating a hostile work environment.[6] *See* ECF 62 at 17–21. The Court finds that Jiggetts' reclassification claim is time-barred; that there is no evidence that Cipullo's stated, nondiscriminatory reasons for suspension or termination were pretext for race discrimination; and that even viewing the facts in the light most favorable to Jiggetts, she was not subject to a hostile work environment. The Court therefore concludes that Defendants are entitled to summary judgment as to Count III.

*Reclassification*

Jiggetts argues that Cipullo discriminated against her by denying her request to reclassify her position from Grade 13 to Grade 14. The parties agree that this occurred in and around August 2012. *See* ECF 62-1 ¶ 7. This claim therefore falls outside the statute of limitations and is time-barred.

---

[6] In her response to Defendants' interrogatories, Jiggetts listed eleven actions that she believed were discriminatory. *See* ECF 59-26 ¶ 17. But in her opposition, Jiggetts focuses only on these four actions. *See* ECF 62 at 17–21. The Court can only assume that she has chosen to narrow her race discrimination claim to focus on these four allegedly discriminatory acts.

*Suspension Recommendation & Termination*

On November 6, 2014, Cipullo recommended that Jiggetts be suspended for five days "for gross negligence in [her] performance of her job duties, and failure to obey written and oral directives." ECF 62-1 ¶ 21; *see* ECF 59-10. Jiggetts did not serve that suspension. Instead, on December 19, 2014, Martinez-Vega issued a notice stating that a temporary suspension "isn't severe enough," withdrawing Cipullo's recommendation to suspend Jiggetts, and recommending instead that Jiggetts be terminated. ECF 59-17 at 15. Again, that notice explained that Jiggetts should be terminated for "for gross negligence in her work responsibilities . . . and for failing to comply with written and oral directives from her supervisors." ECF 62-1 ¶ 48; *see* ECF 59-17 at 1, 15–16. On March 19, 2015, Bailey affirmed Martinez-Vega's recommendation to terminate Jiggetts. ECF 62-1 ¶ 49; *see* ECF 59-22 at 3. Jiggetts' termination became effective in April 2015. ECF 62-1 ¶ 1.

The Court will first address two threshold issues, neither of which ultimately impacts the outcome. First, it is unclear whether a *recommended* personnel action (here, Cipullo's recommendation to suspend Jiggetts) gives rise to an actionable discrimination claim—at least in a case where the recommendation is never implemented and does not itself impact the terms or conditions of employment. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024) (holding that employee must show "some harm respecting an identifiable term or condition of employment" to make out an employment discrimination claim). But because Jiggetts contends that her employers "escalated" the recommended suspension to a termination, and a termination is of course an adverse action, the Court will examine both the suspension recommendation and the termination. ECF 62-1 ¶ 29.

Second, there is some dispute about the extent of Cipullo's role, if any, in the decision to terminate Jiggetts. Cipullo—not Martinez-Vega or Bailey—is the named defendant here. *See Navab-Safavi v. Glassman*, 637 F.3d 311, 319 (D.C. Cir. 2011) ("[I]n actions against public officials for violation of constitutional rights, 'officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009))). Defendants point to record evidence establishing that Cipullo was not the decision-maker for Jiggetts' termination. Cipullo testified that, after the November 6, 2014 incident, he spoke with his supervisors and recused himself from further personnel actions regarding Jiggetts. *See* ECF 59-3 at 122–23. All information he had gathered about the overdetentions was transferred to Martinez-Vega, and it was Martinez-Vega who recommended Jiggetts' termination. *Id.* at 123–24. Cipullo swears that he had "no input in the decision," *id.* at 123, and Martinez-Vega also testified that the decision whether to recommend termination was "solely" her own, ECF 59-23 at 8. That is reflected in the notice of recommended termination itself, which states: "Mr. Cipullo has recused himself from this personnel action because of the pending felony case against your husband, Stephen Jiggetts. Therefore, the authority to proceed with this personnel action resides with me [Martinez-Vega] as the Deputy Director of the Criminal Division." ECF 59-17 at 1; *see also* ECF 59-23 at 8 (Martinez-Vega, testifying that she "issued the recommendation instead of Mr. Cipullo because an incident . . . occurred between Mr. Cipullo and Ms. Jiggetts' husband, and, as a result, he recused himself from the process").

Jiggetts does not identify record evidence to refute the fact that Cipullo was not the formal decision-maker directing her termination. The Court understands her to be arguing, however, that Cipullo is ultimately responsible for her termination because he initiated the disciplinary process and turned over the information Martinez-Vega used to make her decision. Jiggetts does identify

testimony suggesting that Martinez-Vega had some conversation with Cipullo about the recommended suspension. *See* ECF 62 at 18; ECF 62-13 at 2. During her deposition, Martinez-Vega was first asked, "When Mr. Cipullo issued the notice of proposed adverse action for the five-day suspension, did he discuss it with you?" ECF 62-13 at 1. She responded, "[n]o." *Id.* Later, Martinez-Vega was asked whether she "ever talked to Mr. Cipullo about why he was recommending a five-day suspension." *Id.* at 2. She answered: "Yes. Yes." *Id.* Admittedly, this evidence is quite thin—but viewed in the light most favorable to Jiggetts, a reasonable jury could find that Cipullo played a role in her termination. The Court therefore considers both the recommended suspension and the termination in evaluating Jiggetts' race discrimination claim.

Turning now to the merits: the Court first lays out Defendants' proffered, nondiscriminatory reasons for recommending that Jiggetts be suspended and terminating her, which are described at length in the notice of recommended suspension, ECF 59-10, and notice of recommended termination, ECF 59-17. The burden then shifts to Jiggetts to show that her employer's asserted reasons for taking these actions were pretextual. *See Brady*, 520 F.3d at 494.

Cipullo's notice includes the following legitimate, nondiscriminatory justifications for recommending that Jiggetts be suspended. *See* ECF 59-10. Jiggetts was assigned to monitor halfway house placements "because there ha[d] been a history of problems with these placements and defendants getting lost at the jail and not being timely placed." *Id.* at 3. In November 2012, a Superior Court judge alerted Cipullo that a defendant "had languished at the jail for over a week" and had lost her employment because she was not timely released. *Id.* at 1. The judge complained that Jiggetts failed to appropriately follow up to ensure the defendant was placed in a halfway house, and then failed to return the judge's urgent phone call about the matter. *Id.* Jiggetts told Cipullo that she did not return the judge's call because she "perceived that [the judge] had been

rude" to her." *Id.* After that incident, Cipullo and Martinez-Vega told Jiggetts that they expected her "to follow-up on the halfway house placements, to be proactive, and to take necessary steps . . . to ensure that defendants were getting timely placed." *Id.* at 2. Jiggetts responded that she "would prefer that the judges monitor the placement and only get [her] involved when there was a problem." *Id.* Cipullo told Jiggetts that it was her job, not the judges' job, to follow-up on placements, and that she needed to "actively monitor" placements, "take whatever action was necessary to resolve any problems," and alert Cipullo if she could not resolve a problem so that he could assist her. *Id.* Cipullo received additional complaints from judges in January and November 2013. *Id.* at 2. Each time, he spoke with Jiggetts about "the importance of monitoring the process and proactively making sure that defendants were not lingering at the jail." *Id.*

Cipullo's notice also recounted that, in mid-August 2014, a defendant—John Young—was ordered to be released from D.C. Jail to a halfway house. *Id.* at 1. According to the notice, Jiggetts failed to monitor the halfway house log and failed to ensure that Young was appropriately placed in a halfway house. *Id.* at 3. As a result, Young was detained wrongfully in jail for more than 30 days. *Id.* Although Jiggetts had told Cipullo that she updated the log weekly, the log itself showed that Jiggetts failed (at least twice) to update the log for two weeks during the period in which Young was improperly detained. *Id.* In fact, according to the notice, Jiggetts only learned that Young had been overdetained when a law clerk reached out to her about the problem in mid-September. *Id.* at 1.

In addition to the overdetention itself, the notice also explained that Jiggetts failed to inform Cipullo about Young's wrongful detention, and that Cipullo found out only because he reviewed Jiggetts' work and discovered the email from the law clerk *Id.* at 3. Cipullo asked Jiggetts about Young's overdetention twice, but Jiggetts did not provide a straight answer. *See id.* at 3–4. When

Cipullo asked her a third time, Jiggetts provided an explanation that Cipullo determined to be inaccurate. *Id.* at 4. Finally, the notice cited a number of instances in which Jiggetts failed to comply with either written or oral directives from Cipullo. *See id.* at 4–7.

Martinez-Vega's notice of termination similarly provided a litany of legitimate, nondiscriminatory reasons for terminating Jiggetts. *See* ECF 59-17. Martinez-Vega explained that she had reviewed Jiggetts' halfway house log and identified ten defendants, in addition to Mr. Young, who were overdetained on Jiggetts' watch—all for more than a week, and some for more than a month. *See id.* at 6–10. To cite just one illustrative example: Chantel Cooper was ordered to be released to a halfway house on August 26, 2014. *Id.* at 6. Jiggetts' law clerk alerted her on September 10 and again on September 25 that Ms. Cooper had not been placed. *Id.* On September 30, Jiggetts emailed the halfway house administrator (Mr. Murphy) about Ms. Cooper as well as other defendants. *Id.* Murphy responded to Jiggetts indicating that Ms. Cooper could not be placed because of a misdemeanor arrest warrant. *Id.* Rather than reaching out to the prosecutor, the Metropolitan Police Department, or the Department of Corrections to make sure Ms. Cooper was promptly arraigned on the misdemeanor arrest warrant and could then be released to the halfway house, as was expected of her, Jiggetts performed "no follow up." *Id.* at 6–7. Ms. Cooper was not arraigned on the warrant until October 28—and only after Cipullo, on October 25, informed Jiggetts that Ms. Cooper was *still* detained. *Id.* at 6. Martinez-Vega concluded that Ms. Cooper was detained improperly for more than two months, and that Jiggetts' failure to follow her own procedures to monitor placements contributed to that overdetention. *Id.* at 7; *see also* ECF 59-23 at 19–20 (Martinez-Vega, testifying that she discovered "a significant number of defendants who were not timely placed and that nothing had been done in terms of monitoring the

status of why they were not released to the halfway house," even though there were empty beds at halfway houses where those defendants could have been placed).

Martinez-Vega emphasized in her notice that these overdetentions were "a very serious matter" and "ha[d] caused [her] to lose confidence in [Jiggetts'] ability to perform these important duties." ECF 59-17 at 10. She also expressed concern that Jiggetts had failed to take responsibility for these oversights and, even after learning of Mr. Young's detention, had not gone back to determine whether any other defendants had been overdetained. *Id.* at 2, 10. Martinez-Vega concluded that Jiggetts had "neglected incarcerated individuals" and "displayed a pattern of callousness or willful indifference to their interests and to the judicial officers['] need to facilitate the least restrictive conditions of release as required by the law." *Id.* at 10. Finally, Martinez-Vega listed numerous instances in which Jiggetts had failed to obey her supervisors' written and oral directives. *Id.* at 10–15. Because Jiggetts' errors had "render[ed] [her] a liability to the division" and caused her supervisors "to lose confidence in [her] as an Attorney Advisor," Martinez-Vega withdrew Cipullo's recommended suspension and instead recommended that Jiggetts be terminated. *Id.* at 15.

"[D]issatisfaction with an employee's performance and identifying specific examples of the employee's inadequate performance is a legitimate, non-discriminatory reason for an adverse action." *Hogan v. Hayden*, 406 F. Supp. 3d 32, 44 (D.D.C. 2019) (citing *Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 29 (D.C. Cir. 1997)). The burden therefore shifts to Jiggetts to show that the asserted reasons for her recommended suspension and termination were pretextual. *See Brady*, 520 F.3d at 494. She has not done that.

First, Jiggetts argues that her employer's stated reasons for these adverse actions were pretextual because she "was not derelict in her duties as they relate to halfway house placements."[7] ECF 62 at 20. Jiggetts states that the record contains (1) emails between her and "persons involved in the placement of inmates in halfway houses" and "emails in support of Jiggetts' assistance to the Halfway House Administrator"; (2) Jiggetts' telephone log that shows similar communications; and (3) "a log created by Jiggetts and maintained by herself and her law clerk to monitor placements." ECF 62 at 20. Jiggetts does not provide record citations to support her assertions, *see id.*, and the Court cannot find either a phone log or the halfway house log in the record. Jiggetts does submit emails in which Superior Court judges, clerks, and attorneys thanked her for helping to resolve prisoner issues. *See* ECF 62-4. But none of those emails seem to relate to Young's overdetention, or to any of the other specific complaints Cipullo and Martinez-Vega listed in the notice of suspension. *See id.* And looking to Jiggetts' response to Defendants' statement of material facts, she does not identify any record evidence—emails or otherwise—to dispute that her negligence resulted in Young's overdetention. *See* ECF 62-1 ¶¶ 12–14. (Instead, she says that she "cannot recall the circumstances of this particular placement." *Id.*) Nor does she point to any record evidence related to the ten additional defendants Martinez-Vega identified as having been overdetained. *See generally* ECF 62-1. The fact that Jiggetts performed her duties well on some *other* occasions does not contradict her employers' assertion that she—on multiple, specific occasions, and particularly in the case of Mr. Young—performed her duties so poorly that defendants were unlawfully overdetained and judges lodged complaints about those incidents.

Jiggetts also argues (again, with no citation to the record), that she took efforts "to explain to Cipullo that [she] does not have authority to release an inmate to a halfway house – that authority

---

[7] Jiggetts also claims summarily that she "was not insubordinate," but provides no explanation or evidence to support that assertion. ECF 62 at 20.

rests with the D.C. Department of Corrections"; that Cipullo had "absolutely no understanding of the time frames noted for placement [and] no knowledge about impediments to placement"; and that Cipullo "determined on his own that certain individuals were 'overdetained' and that this was due to Jiggetts['] alleged failure to monitor placements." ECF 62 at 20. But Cipullo's notice of suspension did not fault Jiggetts for failing to actually release inmates to halfway houses herself—rather, Cipullo claimed that Jiggetts did not take appropriate steps to monitor placements, identify barriers to placement, attempt to resolve those issues, and contact Cipullo or the General Counsel if she could not resolve the issue.[8] *See* ECF 59-10 at 2–4. Although Jiggetts purports to dispute whether she was "responsible for proactively monitoring halfway house placements" before November 2012, she does not seem to dispute that she was responsible for doing so after November 2012. *See* ECF 62-1 ¶ 10. In fact, Jiggetts agreed during her deposition that her job was to "keep track of the individuals who had been ordered for halfway house placements and . . . [if] there was a situation in which someone was sitting at the jail for longer than what would have been the expected period of time, . . . [to] follow up on that." ECF 59-1 at 109. She also admitted that, after the November 2012 complaint, Cipullo instructed her to "take a more proactive approach" in monitoring placements. *Id.* at 110.

Jiggetts similarly argues that Martinez-Vega "wrongfully recommended termination of Jiggetts for allegedly failing to monitor halfway house placements as [Martinez-]Vega herself had no clue whatsoever whether Jiggetts was monitoring the placements or not." ECF 62 at 10. Jiggetts relies on Martinez-Vega's testimony that she (Martinez-Vega) did not communicate with Murphy, the halfway house administrator. ECF 62-3 at 1, 6. But Martinez-Vega's notice of termination did

---

[8] In Young's case, for example, a law clerk determined that Young had not been released to a halfway house, contacted the halfway house administrator, was told that Young had an outstanding warrant, researched the issue, and determined that in fact there was no outstanding warrant. ECF 59-10 at 1. Those steps allowed Young to be released to the halfway house. *Id.*

not purport to rely on any communications with Murphy—it relied on an examination of Jiggetts' own records. *See* ECF 59-17 at 5 (explaining that she reviewed Jiggetts' halfway house log); ECF 59-23 at 20–21, 29 (testifying that she examined Jiggetts' email and phone records and determined that Jiggetts had not been as communicative with DOC as she had represented). Jiggetts also claims that "[i]t is clear from [Martinez-]Vega's testimony at an Administrative Hearing that she had no knowledge of halfway house placements, and therefore, no ability to assess or determine whether Jiggetts monitored halfway house placements." ECF 62 at 18. But that testimony demonstrates only that Martinez-Vega was asked certain questions about how halfway house placements are monitored and answered those questions. *See* ECF 62-3 at 2–5. Jiggetts does not explain how this testimony could suggest that Martinez-Vega "had no knowledge of halfway house placements." ECF 62 at 18.

If Jiggetts believes that Young and the other defendants identified by Cipullo and Martinez-Vega were not overdetained, or that it was not her fault that they were overdetained, she must point to specific evidence in the record to show that there is a genuine factual dispute about those claims. Absent such evidence, Jiggetts' argument amounts to an unsworn, unsupported assertion that she disagrees with her supervisors' assessments of the quality of her performance. That is insufficient to survive summary judgment. *See Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) ("[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000))).

Next, as evidence of racial animus, Jiggetts argues that there were pay disparities between Superior Court's African-American and white attorneys. *See* ECF 62 at 20; *see also id.* at 13–14. Defendants submit a summary of Superior Court salary data for the relevant period, establishing

that all Superior Court Attorney Advisors were paid at Grade 13 and that Jiggetts made an above-average salary compared to her fellow Attorney Advisors. *See* ECF 59-25 at 6. Jiggetts disputes this, arguing that Nancy McKinney, who is white, made more than African-American employees in the Criminal Division. ECF 62-1 ¶ 57. But McKinney is not similarly situated to Jiggetts, because the two had different jobs. Jiggetts was an Attorney Advisor; McKinney was a Branch Chief who applied for and received a promotion to a Grade 14 position as a Project and Program Manager in the Criminal Division. ECF 62-1 ¶ 59; *see* ECF 59-3 at 57–58 (describing McKinney's role as "data setup for . . . [the Court's] new database system"). The fact that employees who performed different duties at different levels were paid different salaries does not, without more, establish racial animus. *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115–16 (D.C. Cir. 2016) (explaining that employees are "similarly situated" only if their employment situations—including their "job and job duties"—are "nearly identical").

Jiggetts also points to several instances in which other African-American women at Superior Court accused Cipullo of racism. In November 2014, Sonya Miranda—an African-American woman—filed an EEOC complaint accusing Cipullo of race discrimination. *See* ECF 62 at 21; ECF 62-15. At some unknown point in time, Cipullo reprimanded two African-American female employees for their performance, and they responded: "you are not some master, and I am not some pickaninny slave on your plantation," *see* ECF 62 at 19; ECF 59-3 at 130–31. An employer's poor treatment of other employees in the same protected group can be relevant evidence of discrimination. *Walker*, 798 F.3d at 1092. But the D.C. Circuit has held that "the mere filing" of discrimination complaints—particularly where nothing is known about the merit or outcome of those complaints—cannot serve as "proxy to establish [the employer's] discriminatory animus" in resolving a motion for summary judgment. *Holcomb v. Powell*, 433

F.3d 889, 899–900 (D.C. Cir. 2006). The other employees involved in these disputes with Cipullo were apparently not deposed for this case—at least, Jiggetts does not point the Court to sworn testimony from any other employee. Absent additional information about the outcome of Miranda's EEOC complaint or of the other two employees' verbal accusations of racism, the Court cannot conclude that these complaints—without more—are evidence of pretext.

Finally, Jiggetts argues that Cipullo called Cooper a "bitch." [9] *See* ECF 62 at 14; ECF 58-3 at 8. (Cipullo admits to doing so but says that he was "joking." ECF 59-3 at 29.) A decisionmaker's discriminatory statements can of course serve as evidence of pretext, *Brady*, 520 F.3d at 495 n.3, and calling a supervisee a "bitch" is unacceptable. But Jiggetts does not explain how the use of this particular term is evidence of *racial* animus. Without some further information about the context in which Cipullo made this comment to another employee, the Court cannot find that this single incident is evidence that Cipullo's stated reason for recommending Jiggetts' suspension was in fact pretext for race discrimination.

In sum: Defendants have proffered facts and evidence establishing that Jiggetts' supervisors recommended she be suspended, and ultimately terminated, because of her poor performance. Jiggetts has not adequately disputed that evidence by citing anything in the record that suggests those recommendations were made not because of her poor performance, but because of her race.

*Hostile Work Environment*

Jiggetts contends that Cipullo subjected her to a racially discriminatory hostile work environment. To prevail on a hostile work environment claim, a plaintiff must show that "she was

---

[9] Jiggetts argues that Cipullo "used derogatory terms like 'bitch' in reference to female African-American employees of the Criminal Division," ECF 62 at 19—but the only instance of such behavior in the record is the incident in which Cipullo called Cooper a "bitch."

subjected to discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014). That requirement includes both a subjective and objective element. In other words, even if an employee subjectively views her environment as abusive, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21. Neither the "ordinary tribulations of the workplace" nor "petty insults, vindictive behavior, and angry recriminations" are sufficient. *Brooks*, 748 F.3d at 1277–78. This analysis requires the Court to look "at all the circumstances, including the frequency of the [alleged] discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Vickers v. Powell*, 493 F.3d 186, 197 (D.C. Cir. 2007).

Jiggetts references several incidents in her opposition that are either not supported by the record or could not give rise to a hostile work environment claim. Jiggetts argues that Cipullo created a work environment in which "other managers . . . felt it was okay to make and post on social media statements such as 'That's why I hate black people now,'" ECF 62 at 19—but there is no evidence of such social media posts in the record (or even citations to sworn testimony in the record confirming the existence of those posts). From her opposition alone, the Court has no idea who made those statements, how Jiggetts knows about them, or how they are linked to Cipullo's management. Jiggetts again points to the fact that Cipullo called Cooper a "bitch," *see* ECF 62 at 19; ECF 58-3 at 8, and that he (at some unknown point in time) reprimanded two African-American female employees who responded: "you are not some master, and I am not some

pickaninny slave on your plantation," *see* ECF 62 at 19; ECF 59-3 at 130–31. Such behavior is troubling, but Jiggetts does not suggest that she was present when any of these comments were made—and "[c]omments made outside of the employee's presence are generally not actionable as the basis for a hostile work environment claim." *Saulsberry v. Barr*, 468 F. Supp. 3d 340, 349 (D.D.C. 2020) (quoting *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 91 (D.D.C. 2013)). Jiggetts also alleges that Cipullo "grabb[ed] his genitals in a workplace event that was caught on camera." ECF 62 at 19. Again, that is a troubling accusation, but Jiggetts does not claim she was present when that incident occurred and does not explain how such behavior is an instance of *race* discrimination. (Jiggetts does not claim, for example, that she was sexually harassed or discriminated against because of her gender.) *See Harris v. Wackenhut Servs.*, Inc., 419 F. App'x 1, 2 (D.C. Cir. 2011) (per curiam) (holding that evidence that "bears no connection to [the plaintiff's] race cannot support a hostile work environment claim"). And finally, Jiggetts emphasizes that she was terminated, *see* ECF 62 at 19—but as the Court has already explained, she has not amassed evidence in discovery to refute Defendants' proffered facts about her work performance or to otherwise establish that she was terminated because of her race.[10]

---

[10] In her response to Defendants' statement of material facts, Jiggetts contends that Cipullo "acknowledge[d] in his deposition that he made racially offensive comments to Jiggetts and to other African American employees," and relies on several citations to his deposition. ECF 62-1 ¶ 61. First, she cites to portions of Cipullo's deposition in which he admits to calling Cooper a "bitch" and states that he reprimanded two African-American female employees who responded: "you are not some master, and I am not some pickaninny slave on your plantation." *See* ECF 62-1 ¶ 61 (citing ECF 59-3 at 29–30, 129–31). As the Court has already explained, those incidents do not support Jiggetts' hostile work environment claim. Second, she relies on testimony about Cipullo's behavior during the November 4 meeting. *See id.* (citing 59-3 at 86, 88, 90–91). The Court takes up that issue below. And third, Jiggetts cites to a section of Cipullo's deposition in which he was asked whether other African-American women had filed discrimination complaints about him. *See id.* (citing ECF 59-3 at 125–28). He testified that (1) Cooper filed a bullying complaint, (2) Sonya Miranda filed an EEOC complaint against the Superior Court, (3) Margaret Robertson was fired during her probationary period and subsequently brought a lawsuit, and (4) Monica Wilkerson asked to be transferred out of the Criminal Division. *See* ECF 59-3 at 125–28. Nowhere in this testimony does Cipullo "acknowledge[] . . . that he made racially offensive comments to . . . African American employees," as Jiggetts contends. ECF 62-1 ¶ 61. Furthermore, Cooper stated expressly in her bullying complaint that she was not alleging mistreatment because of her race (or indeed because of any protected characteristic). *See* ECF 58-8 at 1. Cipullo did not testify, and Jiggetts has not pointed to any evidence suggesting, that Robertson was fired or Wilkerson sought a transfer because of discriminatory conduct or racist remarks by Cipullo. And as the Court has already explained in reference to Miranda's EEOC complaint, the "mere filing" of discrimination complaints—particularly where nothing

That leaves three incidents that could contribute to Jiggetts' hostile work environment claim. First, Jiggetts argues that Cipullo sent her "daily emails" that required her to "complete tasks that no other Criminal Division employee was required to do." ECF 62 at 19. Jiggetts does not cite to any record evidence, but Defendant understands those "tasks" to refer to the fact that, in September 2014, Cipullo asked Jiggetts to "provide all her work product for the previous two weeks."[11] *See* ECF 66 at 18. Second, Jiggetts contends that during a November 4, 2014 meeting, Cipullo yelled at her, berated her, and banged on the table. *See* ECF 62 at 19; ECF 62-1 ¶ 18; ECF 59-1 at 114. Jiggetts points to Cipullo's testimony that, during that meeting (1) Cipullo told her, "we expect you to work independently," ECF 59-3 at 86; (2) that after Jiggetts refused to answer a question, Martinez-Vega tried to jump in and Cipullo said, "stop, Yvonne. I've asked Tenisha a question. I'm her boss. That is about her job duties. She needs to answer the question and we will sit here and wait until the question is answered," *id.* at 88; and (3) Cipullo asked her why she hadn't updated the halfway house log for weeks and how she was monitoring placements, *id.* And third, when Cipullo served Jiggetts with his notice of recommended suspension on November 6, 2014, he stood in the doorway of her office and refused to move as Jiggetts tried to leave, despite her repeated requests that he move out of her way. *See* ECF 62 at 19; ECF 59-1 at 117. Even construing the facts in the light most favorable to Jiggetts, the Court cannot find that requiring an employee to submit examples of her work product, yelling at her, asking her questions about her job performance, and temporarily blocking her exit from her office rise to the level of a

---

is known about the merit or outcome of those complaints—cannot serve as "proxy to establish [the employer's] discriminatory animus" in resolving a motion for summary judgment. *Holcomb*, 433 F.3d at 899–900.

[11] Jiggetts does not cite to anything in the record to support her argument that Cipullo sent her daily emails that could form the basis of any hostile work environment claim." ECF 62 at 19. Jiggetts does attach three emails from Cipullo to her opposition in which Cipullo (1) suggested that it "might be helpful" for Jiggetts to attend a particular training, (2) followed up on a task she was supposed to complete, and (3) provided guidance on how Jiggetts should prioritize tasks and record her leave time while on intermittent FMLA leave. *See* ECF 62-10. If the attached emails are a representative sample of the daily emails that she contends Cipullo sent to her, no reasonable jury could conclude that these emails were racially discriminatory or hostile in any way.

hostile work environment. *See Brooks*, 748 F.3d at 1275–76 (holding employee was not subject to hostile work environment where a supervisor insulted and demeaned an employee in front of co-workers, threw a notebook at her, and issued her negative performance reviews); *Baloch v. Kempthorne*, 550 F.3d 1191, 1195 (D.C. Cir. 2008) (holding employee was not subject to hostile work environment where supervisor gave employee poor performance reviews and a letter of reprimand, restricted his ability to take sick leave, proposed that he be suspended, and "allegedly threatened to have [the employee] arrested, led out of the building in handcuffs, and jailed").

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to Count III.

(b) <u>Cooper</u>

Turning now to Cooper's constitutional claim. In her opposition, Cooper argues that Cipullo discriminated against her because of her race when he (1) "promoted three Caucasians over []qualified existing African American staff," (2) "blocked Cooper's requests for a transfer," and (3) "blocked Cooper from getting a job at the Court of Appeals." ECF 63 at 12. Cooper cites to no record evidence to support these allegations. The Court concludes that Defendants are entitled to summary judgment on Cooper's Fifth Amendment claim.

Starting with her claim that Cipullo promoted three white employees over qualified African-American employees. Cooper identifies two white employees who were promoted: Steve Murff and Debbie Grafton. *See id.* It is not clear to the Court whether Cooper is alleging that these employees were promoted instead of her or if she is complaining that they were promoted over other (unidentified) African-American employees. If the former, Defendants point to record evidence, which Cooper does not dispute, establishing that Murff was temporarily promoted around June or July 2013. ECF 58 at 27 ¶¶ 5–6. Cooper herself testified that Grafton was promoted

"[s]everal years before" Murff's promotion. ECF 58-1 at 150–51. Both events therefore occurred more than three years before this suit was filed and would thus fall outside the statute of limitations. If she is claiming the latter—that Cipullo promoted these employees over other, more qualified African-American employees—she cannot pursue race discrimination claims on behalf of other employees who are not plaintiffs in this case.[12] Further, the Court would not know where to begin in assessing such a claim. Cooper points to no information about Murff's or Grafton's qualifications or the qualifications (or even the names) of the employees that Cooper alleges should have been hired instead.

Next, Cooper does not cite, and the Court cannot find, any record evidence that Cipullo prevented Cooper from transferring to another division or from getting a job at the Court of Appeals. *See* ECF 63 at 12. The closest the Court can find is a reference Cooper made during her deposition to the fact that she was interested in transferring to another division—but Cooper did not testify that Cipullo prevented her from making such a transfer. *See* ECF 58-1 at 43–47. Bare allegations unsupported by record evidence are insufficient to survive summary judgment. *See Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002).

Finally, Cooper argues broadly that "Cipullo is a racist, and that everything he did to Cooper was because Cooper was an educated woman of color who questioned his actions." ECF 63 at 11. But again, Cooper cites no evidence to support this claim and provides no specifics that would permit the Court to determine whether there are any factual disputes about Cipullo's conduct for a jury to resolve.

Absent any record evidence to support Cooper's race discrimination allegations, the Court must grant Defendants' motion for summary judgment as to Count IV.

---

[12] Evidence of Cipullo's negative treatment of other members of Cooper's protected class may be relevant evidence to support her discrimination claim, but does not form the basis for her own claim.

2. *First Amendment retaliation*

Cooper and Jiggetts argue that Cipullo violated their First Amendment rights by retaliating against them for filing complaints about race discrimination at Superior Court. Jiggetts contends that Cipullo retaliated against her for filing an EEOC complaint in September 2014, ECF 62 at 21, and Cooper argues that Cipullo retaliated against her for filing an internal bullying complaint in August 2013 and an EEOC complaint in June 2014, ECF 63 at 7.

A public employee alleging First Amendment retaliation must satisfy a four-factor test:

> (1) she "spoke[ ] as a citizen on a matter of public concern"; (2) her interest in commenting on matters of public concern outweigh[s] the government's "interest in promoting the efficiency of the public services it performs through its employees"; (3) "her speech was a substantial or motivating factor in prompting the retaliatory or punitive act"; and (4) she can "refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech."

*Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1176 (D.C. Cir. 2021) (quoting *Wilburn v. Robinson*, 480 F. 3d 1140, 1149 (D.C. Cir. 2007)). The first two factors are questions of law and the latter two are questions of fact. *Wilburn*, 480 F. 3d at 1149.

The Court need not address whether Jiggetts' and Cooper's complaints qualify as protected speech because, even assuming that they do, their claims cannot succeed. Most of the allegedly retaliatory incidents that Jiggetts points to are either unsupported by record evidence or happened before she filed her EEOC complaint. Two of the incidents—Cipullo's mistreatment of Jiggetts on November 4, 2014 and November 6, 2014—do not constitute "adverse actions" that implicate the First Amendment. And finally, as to Jiggetts' termination, she has pointed to no evidence to refute Defendants' showing that they "would have reached the same decision in the absence of the protected speech." *Breiterman*, 15 F.4th at 1176 (quoting *Wilburn*, 480 F.3d at 1149)). Cooper's First Amendment claim also fails: each act she identifies as retaliatory is either time-barred, is not

supported by any record evidence, occurred before her protected speech, was not committed by or attributable to Cipullo, or was not an action taken against Cooper.

      (a) <u>Jiggetts</u>

      Although Jiggetts filed a fulsome opposition to Defendants' motion for summary judgment, her First Amendment argument was limited to a single sentence: "The Defendants have not provided any supporting evidence to refute Plaintiff Jiggetts claim that Cipullo retaliated against Jiggetts for filing an external EEOC complaint against him in September 2014." ECF 62 at 21. In light of Jiggetts' pro se status, the Court has endeavored to look elsewhere in her filings to discern whether Jiggetts has made out a viable First Amendment retaliation claim. In her response to Defendants' interrogatories, Jiggetts states that Cipullo took the following actions in retaliation for filing an EEOC complaint: (1) creating a hostile work environment; (2) discrediting her work and accomplishments; (3) interfering with her ability to transfer or otherwise obtain employment in other divisions of the court; (4) abolishing her compressed day off; (5) violating her FMLA rights; (6) berating, belittling, and humiliating her during a meeting on November 4, 2014; (7) illegally detaining her in her office on November 6, 2014; (8) using excessive force against her on November 17, 2014; (9) intentionally causing her emotional distress on November 17, 2014; and (10) terminating her employment without just cause. ECF 59-26 ¶ 16.[13] The Court evaluates whether any of these alleged retaliatory actions could support a First Amendment claim, and concludes that they cannot.

---

[13] In her response to Defendants' statement of material facts, Jiggetts disputes that the alleged retaliatory acts are "limited" to this list. *See* ECF 62-1 ¶ 60. But Jiggetts does not point to any additional actions she believes were retaliatory and, again, Jiggetts makes no substantive argument about the First Amendment in her opposition. The Court therefore confines its analysis to those retaliatory actions Jiggetts identified in her response to Defendants' interrogatories.

Many of these allegedly retaliatory acts are unsupported by either the record or the law. The Court has already determined that Jiggetts was not subject to a hostile work environment. *See supra* Part III.A.1(a). Jiggetts does not point to any record evidence of Cipullo "discrediting her work and accomplishments," nor can the Court discern what incidents she may be referring to. Cipullo was not present during the November 17 incident, *see* ECF 62-1 ¶¶ 30–47, so there can be no argument that he used excessive force against Jiggetts or intentionally caused her emotional distress on that date.

Any actions taken *before* Jiggetts filed her EEOC charge on September 22, 2014 cannot have been taken in retaliation for that complaint. *See* ECF 59-24 at 1; *Blackmon-Malloy v. U.S. Capitol Police Bd.*, No. 01-CV-2221, 2024 WL 4298853, at *56 (D.D.C. Sept. 26, 2024) ("[R]etaliation, by its very nature, requires the protected activity to occur before the complained about conduct."). Jiggetts argues that Cipullo interfered with her ability to transfer to another division by delaying the submission of her 2013 performance evaluation until July 2014. *See* ECF 59-1 at 85–89. She also contends that Cipullo interfered with her FMLA rights by sending her emails and requiring her to work during her approved FMLA leave on September 10 and 11, 2014. *See* ECF 62 at 14–15. These events predated Jiggetts' EEOC charge, and therefore cannot have been taken in retaliation for that EEOC charge.

Jiggetts contends that Cipullo revoked her compressed day off in retaliation for filing an EEOC complaint. ECF 62 at 16. Cipullo testified that it was Martinez-Vega who made the decision to revoke Jiggetts' compressed day off, and that he does not know why that decision was made. *See* ECF 59-3 at 79 ("I didn't grant your compressed day and I didn't take it away. Ms. Vega was your direct supervisor for those purposes . . . and that's who made those decisions); ECF 59-14 at 11 ("I did not make the decision to revoke Ms. Jiggetts's compressed day off and I do not know

why the decision was made."). Jiggetts does not point to any record evidence to dispute that testimony. *See generally* ECF 62. Because it is undisputed that Cipullo did not revoke Jiggetts' compressed day off, that incident cannot support Jiggetts' First Amendment retaliation claim against Cipullo.

It is also undisputed that Jiggetts did not tell Cipullo that she was applying for other positions at Superior Court. ECF 62-1 ¶ 51. Jiggetts does not point to any evidence to suggest that Cipullo otherwise knew that she wanted to transfer to a different division. She does not explain (and the Court cannot understand) how Cipullo could have purposefully interfered with her ability to transfer to another division if he did not know that she wanted to make such a transfer.

The Court is left with only three incidents that could give rise to Jiggetts' First Amendment claim: Jiggetts' termination, and Cipullo's behavior during the November 4, 2014 and November 6, 2014 meetings. *See* ECF 59-26 ¶ 16. As the Court has explained at length above, Defendants have made a showing that they would have terminated Jiggetts "in the absence of the protected speech" given her serious performance deficiencies. *See supra* Part III.A.1(a). And, as the Court has explained, Jiggetts has not rebutted that showing. *See supra id.* That leaves the November 4 and November 6 meetings, neither of which qualifies as an "adverse action" taken in retaliation for Jiggetts' protected speech. *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). Although an adverse action need not be as severe as a termination or demotion to give rise to a First Amendment claim, *see Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75 (1990), "no one would think that a mere frown from a supervisor constitutes a sufficiently adverse action to give rise to an actionable First Amendment claim," *Houston Cmty. Coll. Sys.*, 595 U.S. at 477. Courts have remarked that "[m]ere harsh words . . . are insufficient to constitute an actionable adverse employment action" in the context of a First Amendment retaliation claim. *Bollinger v. Thawley*,

304 F. App'x 612, 614 (9th Cir. 2008); *see, e.g.*, *Sensabaugh v. Halliburton*, 937 F.3d 621, 628 (6th Cir. 2019) (holding that employer's letter of reprimand was not an adverse action for First Amendment retaliation purposes); *Houston Cmty. Coll. Sys.*, 595 U.S. at 474, 478–79 (holding, albeit in a factual context different from the one here, that a "purely verbal censure" did not give rise to a First Amendment claim).

Jiggetts testified that, while discussing overdetentions during the November 4 meeting, Cipullo became angry, raised his voice, "was banging on the table," and told Jiggetts, "you're going to do this, you're going to do this. . . . We pay you good money, you're going to do this." ECF 59-1 at 114. She further testified that, when Cipullo came to her office to serve her with a notice of suspension on November 6, Cipullo stood blocking the doorway and holding the doorknob so that she could not leave her office. ECF 59-1 at 117. Jiggetts "asked excuse me three times and he would not move." *Id.* (It is worth noting that the Court previously dismissed Jiggetts' claim that Cipullo "unreasonably seized" her in violation of the Fourth Amendment by standing in her doorway. *See* ECF 40 at 33.) Even taking the evidence in the light most favorable to her, Jiggetts does not explain how shouting at her about her performance at work and standing in her doorway for a short period of time constitute "adverse actions."

Even if the November 4 and November 6 incidents were adverse actions, Jiggetts' claim would still fail for two additional reasons. The first is qualified immunity, which shields officials from liability for claims of unlawful conduct, so long as that conduct does not violate clearly established statutory or constitutional law. *Pearson v. Callahan*, 555 U.S. 223, 232–33 (2009). For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Jiggetts has not pointed to any case law clearly establishing that a reasonable person in Cipullo's position

would have understood that raising his voice at an employee or standing in her doorway for several minutes could constitute First Amendment retaliation. *Cf. Bollinger*, 304 F. App'x at 614; *Houston Cmty. Coll. Sys.*, 595 U.S. at 474, 478–79. The second problem for Jiggetts is that she has presented no evidence that, absent her EEOC complaint, the November 4 and November 6 meetings would have gone any differently. *See Wilburn*, 480 F. 3d at 1149. Cipullo testified, and Jiggetts does not dispute, that the purpose of the November 4 meeting was to discuss the overdetentions. *See* ECF 59-3 at 85–90; *see generally* ECF 62. As far as the Court can tell—and even construing the facts in the light most favorable to Jiggetts—Cipullo was yelling not about Jiggetts' EEOC complaint or any other protected activity, but about the overdetentions. *See* ECF 59-3 at 85–90; ECF 59-10 at 6 ("On November 4th I asked you to meet with me and Ms. Martinez-Vega to go over the list [of defendants] to make sure there were no more problems."). The Court cannot find any evidence in the record, and Jiggetts does not identify any, to suggest that Jiggetts' EEOC complaint came up during that meeting. Similarly, the Court is not aware of any evidence that Cipullo stood in Jiggetts' doorway on November 6 because she had previously filed an EEOC complaint, rather than because he was trying to talk to her about the notice of recommended suspension.

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to Count I.

### (b) Cooper

Cooper identifies several allegedly retaliatory acts, but none can support her First Amendment retaliation claim. Each act is either time-barred, predated her protected speech, was not committed by or attributable to Cipullo, was not an action taken against Cooper, or is not

supported by any record evidence. *See* ECF 63 at 7–10. The Court will therefore grant Defendants' motion for summary judgment as to Count II.

Taking these events in roughly chronological order: first, Cooper contends that Cipullo retaliated against her when, "[s]hortly after a Court conference, [he] called Cooper in his office to threaten her for talking about Mr. Murff's promotion and Ms. McKinney's lack of participation in the conference," and "threatened Cooper with termination." ECF 63 at 10. As explained above, any claims based on constitutional violations that occurred before March 2, 2014, are time-barred, and the record establishes that this incident occurred in 2011. *See* ECF 58-4 at 14. Furthermore, actions taken before Cooper engaged in protected speech in August 2013 cannot have been taken in retaliation for that protected activity. *See Blackmon-Malloy*, 2024 WL 4298853, at *56.

Second, there are two incidents for which Cooper does not identify dates but that must have occurred before Cooper filed her Bullying Complaint in August 2013 because they are discussed in that complaint. Cooper states that Cipullo called her a "bitch" in front of other employees, ECF 63 at 8, which Cipullo admits, *see* ECF 58-3 at 8 ("Yes, I definitely called you a bitch."). Cooper also contends that Cipullo approached her in the hallway, "berated" her, told her that "she was damaged and not worth the time to waste on training or coaching," and said he would cancel her sessions with a coach she was working with. ECF 63 at 9; *see* ECF 58-12 at 6. Both of these incidents are described in the August 2013 Bullying Complaint. *See* ECF 58-7 at 4–5. They therefore must be time-barred. And again, actions that predate the protected speech (the August 2013 complaint) cannot have been taken in retaliation for that speech. *See Blackmon-Malloy*, 2024 WL 4298853, at *56.

Third, Cooper argues that Cipullo retaliated against her by stating—during a "surprise meeting" with Shepard, Martinez-Vega, and a Human Resources representative—that Cooper

"had better stop telling people that he promoted a Caucasian male over two black females," and threatening to "take further disciplinary action if she continued to speak about the matter." ECF 63 at 9. The record establishes that meeting occurred "[t]he day after" Cooper filed the Bullying Complaint, which would be August 13, 2013. ECF 58-4 at 13; ECF 58-7 (Bullying Complaint, dated August 12, 2013). This claim, too, is time-barred.

Fourth, Cooper points to two incidents that fall within the statute of limitations but did not involve Cipullo. In September 2014, Carr revoked Cooper's compressed day off. ECF 63 at 8; *see* ECF 58-1 at 65–66; ECF 58-6 at 8 (noting that this occurred in September 2014).[14] And in March 2015, Carr gave Cooper a mid-year evaluation based on a performance plan given to her only one month before. ECF 63 at 8; *see* ECF 58-1 at 56–62, 71–72; ECF 58-6 at 6–7; ECF 58-12 at 4. Cooper expressly disavowed any connection between these events and Cipullo, testifying that she had no evidence that Cipullo had any involvement with either her mid-year performance evaluation or the change to her compressed work schedule. ECF 58-1 at 64, 69. Given this admission and the fact that the Court cannot discern any other evidence in the record that connects Cipullo to these incidents, they cannot support a First Amendment claim where the sole remaining defendant is Cipullo. *See Navab-Safavi*, 637 F.3d at 319.

Fifth, Cooper argues that Cipullo refused to pay $1,500 for her to complete training to become a Certified Court Manager. ECF 63 at 9–10. Cooper points to no record evidence establishing that this occurred, and the Court cannot find any mention of it in the record. A plaintiff cannot defeat a motion for summary judgment on "mere allegations" alone. *Burke*, 286 F.3d at 517.

---

[14] Cooper states in her opposition that Carr revoked her compressed day off in November 2015, ECF 63 at 8, but that would have been after Cooper resigned in April 2015. The Court therefore looks to the record, which establishes that this occurred in September 2014.

Sixth, Cooper states generally that Cipullo "gained a reputation throughout the court of being racist," and "was known for promoting Caucasians" over "more-qualified African Americans." ECF 63 at 10. But Cooper does not say that Cipullo took such alleged actions in retaliation against her for her protected speech, and does not explain how Cipullo's alleged racism bears on this claim—which alleges First Amendment retaliation, not race discrimination. *See id.*

Because Cooper has identified no retaliatory acts that could support her First Amendment claim, the Court grants Defendants' motion for summary judgment as to Count II.

### 3. *Fourth Amendment Claim*

The final constitutional claim in this case is Jiggetts' claim that Officer Parris violated her Fourth Amendment rights to be free from unlawful seizure and excessive force when he forcefully grabbed her by the wrist, twisted her arm behind her back, and threw her into a wall on November 17, 2014. Officer Parris moves for summary judgment on this claim, alleging that his actions were reasonable because he (a) had probable cause to arrest Jiggetts for unlawful entry or simple assault and (b) did not use excessive force. ECF 59 at 48–51. He also contends that he is protected by qualified immunity. *Id.* at 52. But the parties disagree about almost everything that happened during the encounter between Jiggetts and Officer Parris. *See* ECF 62-1 ¶¶ 31–45. These material factual disputes preclude summary judgment.

#### (a) Probable Cause

The Court first considers Officer Parris's argument that he had probable cause to arrest Jiggetts for unlawful entry or simple assault and thus his actions were lawful.[15] An arrest, or seizure, supported by probable cause does not run afoul of the Fourth Amendment. *See, e.g.*, *Beck*

---

[15] Officer Parris argues that he had probable cause to arrest Jiggetts. ECF 59 at 48–51. He does not dispute that he "seized" her. *See id.* Nor does he argue that his interaction with Jiggetts was something short of an arrest requiring probable cause, or that his actions would be justified absent probable cause. *See id.*

*v. Ohio*, 379 U.S. 89, 91 (1964). Officer Parris would have probable cause to arrest Jiggetts if, at the moment of her seizure, "the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [Jiggetts] had committed or was committing an offense" *Id.* Here, the "facts and circumstances" concerning Jiggetts' conduct are hotly contested.

According to Officer Parris, he and Martinez-Vega went to Jiggetts' office on November 17, 2014 to deliver a letter placing her on administrative leave and escort her from the building. ECF 62-1 ¶¶ 30–31. He claims that he handed Jiggetts the letter, instructed her to leave, and told her to take only her personal belongings. *Id.* ¶¶ 32, 34–37; ECF 59-19 at 10. Officer Parris testified that Jiggetts ignored his directives: she "start[ed] packing up more than [her] personal belongings," removed a bag from her credenza, and began putting pictures and other items Officer Parris could not identify in the bag. ECF 59-19 at 10–11. Officer Parris claims that he admonished Jiggetts "three or four times" that she could take only her coat, umbrella, and pocketbook, and that her remaining items would be delivered to her by courier later that day. *Id.* Jiggetts "ignored everything [Parris] was telling [her] and proceeded to do what [she] wanted to do." *Id.* at 11. When he tried to prevent her from taking a bag from the office, Jiggetts—according to Officer Parris— "slapped [his] hand away." ECF 62-1 ¶¶ 39–40; ECF 59-19 at 11. According to Martinez-Vega, Jiggetts "brushed [Officer Parris] off" as he reached for the bag. ECF 62-1 ¶ 40; ECF 59-20 at 1.

If Officer Parris's version of events was undisputed, the Court could conclude that he had probable cause to arrest Jiggetts for unlawful entry in violation of D.C. Code § 22-3302(a). That is because, "where an officer personally asks the plaintiff to leave and the plaintiff refuses, that refusal supplies the probable cause the officer needs to make an arrest for unlawful entry." *McGovern v. George Wash. Univ.*, 245 F. Supp. 3d 167, 185 (D.D.C. 2017), *aff'd sub nom.*

41

*McGovern v. Brown*, 891 F.3d 402 (D.C. Cir. 2018). According to his testimony, Officer Parris told Jiggetts to gather only certain personal items and then leave the building. Instead, she remained in the building "packing up more than [her] personal belongings." ECF 59-19 at 10. And it should go without saying that an officer who reasonably believes that a person has slapped him would have probable cause to arrest that person for assault. *See, e.g.*, *Moore v. United States*, 599 A.2d 1381, 1383 (D.C. 1991) (defining a "battery type" assault as an "attempt or effort, with force or violence, to do injury to the person of another").

But Officer Parris's account is not the only version of this incident in the record. Jiggetts disputes almost all of Defendants' factual assertions about this encounter, and points to record citations from her sworn testimony that describe a different scenario. Jiggetts acknowledges that Officer Parris came to her office to escort her from the building and told her that she "need[ed] to go." *See* ECF 62-1 ¶¶ 33–35; ECF 59-1 at 126. Per Jiggetts, she asked Officer Parris whether she should first log off her computer. ECF 62-1 ¶ 33; ECF 59-1 at 126. He agreed that she should do so, and Jiggetts complied with that instruction. ECF 62-1 ¶ 33; ECF 59-1 at 126. Jiggetts testified that Officer Parris did not give her instructions about taking personal belongings until after she had begun to gather her things. ECF 62-1 ¶ 35; ECF 59-1 at 127. When she turned to the locked, overhead credenza where she kept her purse, Parris admonished her to take only her belongings. ECF 59-1 at 127. Jiggetts testified that she responded: "okay. But my pocketbook is there." *Id.* Then, as Jiggetts was turning the lock to get her purse, Officer Parris grabbed her right arm, twisted it behind her back, and pushed Jiggetts into the wall. *Id.* In other words, according to Jiggetts, she was doing exactly what Officer Parris told her to do—logging off her computer and gathering her personal belongings—before leaving the office. Officer Parris would not have probable cause to

arrest Jiggetts for unlawful entry if she followed his instructions, and that is precisely what she claims she did.

Jiggetts also contends that she never slapped or "brush[ed] off" Officer Parris. ECF 62-1 ¶ 40. Jiggetts provided a relatively detailed account of the November 17 incident during her deposition, and nowhere did she describe making any movements that could reasonably be mistaken by Officer Parris as hitting him. *See* ECF 59-1 at 124–131. According to Jiggetts, the only physical contact she had with Officer Parris was when he grabbed her, twisted her arm, and pushed her into the wall. *See id.* at 127. If a jury credits Jiggetts' account of the altercation and finds there was no physical contact (and no movement that could be mistaken for such physical contact) before Officer Parris grabbed her, then Officer Parris would not have had probable cause to arrest Jiggetts for simple assault.[16]

    (b) Excessive Force

Factual disputes similarly preclude the Court from granting judgment to Officer Parris on Jiggetts' excessive force claim. The reasonableness of a seizure "depends not only on when it is made, but also on how it is carried out." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis omitted). "In general, police officers have authority to use some degree of physical coercion when subduing a suspect . . . as long as the amount of force used is reasonable." *Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011). "Not every push or shove, even if it may later seem

---

[16] Defendants emphasize that Officer Parris "perceived" that Jiggetts ignored his instructions and slapped him. *See* ECF 59 at 26, 50. But even if that was Officer Parris's "perception," that does not change the Court's conclusion that factual disputes preclude summary judgment. It is true that the Court must evaluate the facts and circumstances of this encounter from the officer's perspective; even mistaken beliefs can supply probable cause for an arrest. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause . . . and in those situations courts will not hold that they have violated the Constitution."). But the question remains: was Officer Parris's belief (mistaken or not) that Jiggetts ignored his instructions and slapped him a reasonable one? If the jury credits Jiggetts' account of the interaction and discredits Officer Parris's, they could find that such a belief was not reasonable. In Jiggetts' telling, she complied with all of Officer Parris's instructions and made no physical contact with him at all until he grabbed her arm and twisted it behind her back. Under those circumstances, Officer Parris had no probable cause to believe Jiggetts was committing any crime.

unnecessary in the peace of a judge's chambers, violates [an individual's] constitutional rights." *Id.* However, "[b]ecause the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . its proper application requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. This includes "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Officer Parris acknowledges that the amount and type of force he used against Jiggetts is in dispute. *See* ECF 66 at 25. He claims that he only held onto Jiggetts' wrists; Jiggetts maintains that he grabbed her arm, twisted it behind her back, and pushed her into a wall. *See* ECF 62-1 ¶ 41; ECF 59-1 at 127. But Officer Parris argues that this dispute is immaterial because, even under Jiggetts' account of the incident, he did not use excessive force under the circumstances. *See* ECF 66 at 25. Officer Parris relies primarily on two cases to support this argument. In *Wasserman v. Rodacker*, an officer observed a man walking his dogs without a leash, a criminal offense. 557 F.3d 635, 636 (D.C. Cir. 2009). The officer ordered the man to stop, but the man refused and continued walking. *Id.* The officer caught up to the man and (though the man was offering no resistance) forced the man's arm behind his back, handcuffed him, and arrested him. *Id.* at 636–37. The D.C. Circuit held that the officer's use of force was reasonable, in part because the man's "refusal to obey [the officer's] order prior to his arrest suggested that he might try to resist or escape." *Id.* at 641. And in *Oberwetter v. Hilliard*, a group of police officers entered the Jefferson Memorial and instructed a group of eighteen individuals who were dancing inside to stop and disperse. 639 F.3d at 548. One of the dancers refused, insisting that the officers "provide a lawful reason why she needed to do so." *Id.* The officer shoved that individual against a pillar, twisting

44

her arm behind her back and breaking her headphones. *Id.* As in *Wasserman*, the D.C. Circuit held that the officer's use of force was reasonable. *Id.* at 555. It noted that the lateness of the hour, combined with size and unusual activity of the crowd, made it reasonable for the officer to exert force to subdue the suspect quickly, "reducing the risk of interference or escape." *Id.*

But these cases are only analogous if the Court credits Officer Parris's account of the incident over Jiggetts' testimony. At the summary judgment stage, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences" in that party's favor. *Talavera*, 638 F.3d at 308. And viewed in the light most favorable to Jiggetts, the facts of this case are distinguishable from both *Wasserman* and *Oberwetter* in important ways. First, taking Jiggetts' side of the story as true, Officer Parris—unlike the officers in *Wasserman* and *Oberwetter*—did not have probable cause that Jiggetts had committed any crime. *See supra* Part III.A.3(a). According to Jiggetts, she was complying with Officer Parris's instructions to take her personal items and leave the building, and she did not slap him or otherwise initiate any physical contact. Second, Officer Parris—unlike the officers in *Wasserman*, 557 F.3d at 637, and *Oberwetter,* 639 F.3d at 548—had no reason to fear Jiggetts' escape; after all, he was there to escort Jiggetts out of the building, not to take her into custody. *See Graham*, 490 U.S. at 396. And finally, unlike the plaintiffs in *Wasserman* and *Oberwetter*, Jiggetts did suffer an injury to her shoulder. *See* ECF 59-1 at 130. That injury provides some indicia that the force was excessive. *See Wardlaw v. Pickett*, 1 F.3d 1297, 1304 n.7 (D.C. Cir. 1993).

This case is more akin to *Hall v. District of Columbia* than to either *Wasserman* or *Oberwetter.* 867 F.3d 138 (D.C. Cir. 2017). In *Hall*, a restaurant employee called the police to report that an intoxicated woman had refused to pay her bill. *Id.* at 144. Police located Ms. Hall in the bathroom of a bar across the street, announced themselves, and ordered her to open the door.

*Id.* at 144–45. "[A]lmost immediately" thereafter, officers broke down the bathroom door, threw Hall against the wall, and dragged her out of the bar. *Id.* at 157. Once outside, the officer gripped Hall's arm hard enough to leave a bruise and tightened the handcuffs to the point that she lost feeling in her thumb. *Id.* Because there was "no indication that Hall posed any threat to [the officer] or others, or that Hall had committed a serious crime," the D.C. Circuit held that her excessive force claim should not have been dismissed. *Id.* Viewed in the light most favorable to her, Jiggetts' story is like Hall's: an officer twisted her arm and pushed her up against the wall—even though she was not suspected of any crime and was not threatening anyone's safety—and caused her physical injury. As in *Hall*, that is excessive force.

### (c) Qualified Immunity

Officer Parris argues that he is protected from Jiggetts' Fourth Amendment claims by qualified immunity. ECF 59 at 52. Qualified immunity is an affirmative defense that shields officers from liability for claims of unlawful conduct, so long as that conduct does not violate clearly established statutory or constitutional law. *See Pearson*, 555 U.S. at 232. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. The qualified immunity inquiry turns on whether the officer's actions were objectively reasonable "from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. That reasonableness analysis "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The doctrine "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). However, the Court must still assess the

facts "in the light most favorable to the party asserting the injury." *Corrigan v. District of Columbia*, 841 F.3d 1022, 1035 (D.C. Cir. 2016) (quoting *Saucier*, 533 U.S. at 201).

Defendants argue that Officer Parris is entitled to qualified immunity because he "perceived" that Jiggetts disobeyed his orders and slapped his hand when he reached for her bag. *See* ECF 59 at 26–27, 50; ECF 66 at 23. The central question, for qualified immunity purposes, is whether that perception was reasonable. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."). There are genuine disputes of material fact about what happened on November 17—and if a jury were to resolve those disputes in Jiggetts' favor, then Officer Parris's perception of the incident would be unreasonable. *See Johnson v. District of Columbia*, 528 F.3d 969, 977 (D.C. Cir. 2008) (holding that summary judgment on qualified immunity claim is "premature" where "there exists a genuine issue of material fact"). Jiggetts testified that she complied with all of Officer Parris's orders. *See* ECF 59-1 at 126–30. She does not admit to slapping him or otherwise initiating any physical contact. *See id.* It is clearly established than an officer may not arrest an individual—never mind use excessive force in effectuating that arrest—where the officer has no probable cause to believe the individual has done anything wrong. *See Maryland v. Pringle,* 540 U.S. 366, 370 (2003) (holding that a warrantless arrest is "consistent with the Fourth Amendment if [it] is supported by probable cause"); *Johnson*, 528 F.3d at 977 (explaining that "a police officer must have some justification for the quantum of force he uses").

Of course, a jury may well credit Officer Parris's testimony over Jiggetts'—and if they do, Officer Parris may then be entitled to qualified immunity. But given the material factual disputes about what happened on November 17, the Court cannot find today, as a matter of law, that Officer

47

Parris is entitled to qualified immunity. Accordingly, the Court denies Defendants' motion for summary judgment as to Count VI.

### B. Tort Claims

In addition to her constitutional claims, Jiggetts brings three tort claims against Officer Parris (in his individual capacity) and the District of Columbia: intentional infliction of emotional distress (IIED), ECF 27-1 at 38–39, negligent infliction of emotional distress (NIED), *id.* at 39–40, and negligence, *id.* 40–41. All three claims are based on the confrontation between Jiggetts and Officer Parris on November 17, 2014. Jiggetts has acknowledged that these claims are raised in the alternative. *See* ECF 40 at 43:1-4.

The Court concludes that Jiggetts' IIED claim fails because, as a matter of law, Officer Parris's conduct was not extreme and outrageous as required for that common law claim. And, because Jiggetts has failed to specify any negligent acts that could lead to liability (i.e., acts separate from the intentional torts alleged as part of her IIED claim), the Court also grants summary judgment for Defendants on her NIED and negligence claims.

### 1. *Intentional infliction of emotional distress (IIED)*

To establish a prima facie IIED claim, a plaintiff must show, "(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Williams v. District of Columbia*, 9 A.3d 484, 493–94 (D.C. 2010) (quoting *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003)). IIED is limited to conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 494 (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991)). Even "insults, indignities, [and] threats" do not clear this high bar. *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Under District of

Columbia law, "'a serious case of excessive force' can constitute outrageous behavior such that it satisfies a claim of intentional infliction of emotional distress." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 917 (D.C. Cir. 2015) (quoting *Gabrou v. May Dep't Stores Co*., 462 A.2d 1102, 1105 (D.C. 1983)). However, that does not mean that any "run-of-the-mill excessive-force claim" gives rise to a claim for intentional infliction of emotional distress. *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 70 (D.D.C. 2018). Something more is required, such that a "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Larijani v. Georgetown Univ*., 791 A.2d 41, 44 (D.C. 2002); *see, e.g.*, *Harris*, 776 F.3d at 914, 916–18 (holding that IIED claim survived summary judgment where police arrested plaintiff at a group-therapy session and, after he was already restrained, punched him so hard that it broke his rib); *Daniels v. District of Columbia*, 894 F. Supp. 2d 61, 68 (D.D.C. 2012) (permitting IIED claim to go forward where officers unnecessarily manhandled plaintiff during arrest; when informed she was pregnant, responded, "who cares bitch" and told her to "shut the fuck up"; subjected her to an "intentionally violent ride" to the precinct; and plaintiff had to be hospitalized afterward to stabilize her pregnancy).

As the Court has discussed, a jury could reasonably find that Officer Parris used excessive force in seizing Jiggetts. Jiggetts testified that he twisted her arm behind her back and pushed her into a wall, even though she was complying with his orders. *See* ECF 62-1 ¶ 41; ECF 59-1 at 127. But even considering the record evidence in the light most sympathetic to Jiggetts, the Court cannot conclude—as a matter of law—that Officer Parris acted outrageously. He did not strike Jiggetts after she was detained. *Cf. Harris*, 776 F.3d at 917. Nor is there any evidence of wanton cruelty or outlandish threats. *Cf. Cotton v. District of Columbia*, 541 F. Supp. 2d 195, 206 (D.D.C. 2008) (finding an officer acted outrageously when he threatened an already-detained suspect, who he

knew was not dangerous, that child protective services would take her children away from her).

Jiggetts has not pointed to record evidence to establish that this is anything beyond a "run-of-the-mill" case of excessive force. *See Jackson*, 327 F. Supp. 3d at 70. In short, even granting that Officer Parris's actions were inappropriate, they would not lead an average member of the community to outrage. The Court therefore grants judgment to Defendants as to Count VII.

### 2. *Negligent infliction of emotional distress (NIED)*

Next, Jiggetts alleges that Officer Parris negligently inflicted emotional distress by "plac[ing her] in a zone of physical danger and fail[ing] to adhere to a proper standard of care."[17] ECF 62 at 25. The Court earlier denied Defendants' motion to dismiss Jiggetts' claim for negligent infliction of emotional distress, finding that Jiggetts "plausibly alleged that Officer Parris placed her in a zone of physical harm." ECF 40 at 46–47. However, the Court cautioned Jiggetts that the fact that her claim for negligent infliction of emotional distress survived the motion to dismiss "does not mean that [Jiggetts] will be able to press both theories of liability during [the] later stages of this lawsuit." *Id.* at 52. That is because, in the District of Columbia, if a negligence claim involves use of force by an officer, "that negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care." *District of Columbia v. Chinn*, 839 A.2d 701, 711 (D.C. 2003); *see also Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 759 n.9 (D.C. 2001)

---

[17] A plaintiff in the District of Columbia may proceed on a NIED claim under two theories of liability: the "zone of physical danger" theory and the "special relationship" theory. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810–11 (D.C. 2011) (en banc). Under the "zone of physical danger" theory, a plaintiff must show that "(1) the plaintiff was in a zone of physical danger, which was (2) created by the defendant's negligence, (3) the plaintiff feared for her own safety, and (4) the emotional distress so caused was serious and verifiable." *Cornish v. District of Columbia*, 67 F. Supp. 3d 345, 363 (D.D.C. 2014); *see also Williams v. Baker*, 572 A.2d 1062, 1067 (D.C. 1990). Under the "special relationship" theory, a plaintiff may recover if she can show that "(1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being; (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff; and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Hedgepeth*, 22 A.3d at 810–11.

("[S]ince the conduct alleged, even when viewed in the light most favorable to appellant, is not negligence but an intentional tort, appellant cannot recover damages for negligent infliction of emotional distress."). In other words, Jiggetts cannot sustain a claim for negligence based solely on allegations of intentional conduct. Despite the Court's warning on that point, that is exactly what she is attempting to do. Jiggetts has not identified, nor can the Court discern, a negligent act distinct from the use of force that could give rise to her NIED claim. *See* ECF 62 at 25–26. The Court will therefore grant Defendants' motion for summary judgment as to Count VIII. *See Cotton*, 541 F. Supp. 2d at 209 (dismissing a NIED claim because plaintiff failed to allege a claim separate and distinct from her IIED claim).

   3.  *Negligence*

Jiggetts also contends that Officer Parris is liable for simple negligence for his acts on November 17. ECF 62 at 26. The Court grants summary judgment to Defendants on this claim for the same reasons it granted judgment on Jiggetts' NIED claim: Jiggetts has not pointed to any negligent (rather than intentional) act that could give rise to such a claim. *See Chinn*, 839 A.2d at 711. In her cursory discussion of negligence, Jiggetts remarks that, "the entire incident could have been avoided as Jiggetts was out of the office for a week before this incident and the Notice placing her on Administrative Leave could have been mailed to her at her home address." ECF 62 at 26. Jiggetts cites to no support in the record for that proposition. *See id.* And regardless, it is not clear how that allegation could support a negligence claim against Officer Parris, who was merely the messenger.

Because Jiggetts has failed to identify "at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself," *Chinn*, 839 A.2d at 711, the Court grants Defendants' motion for summary judgment as to Count IX.

### C.  FMLA Claims

Finally, both Jiggetts and Cooper claim that the District of Columbia intentionally interfered with their FMLA leave or retaliated against them for taking that leave. ECF 27-1 ¶¶ 287, 299. "To prevail on an FMLA interference claim, a plaintiff must show (1) employer conduct that reasonably tends to interfere with, restrain, or deny the exercise of FMLA rights, and (2) prejudice arising from the interference." *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020); *see* 29 U.S.C. § 2615(a)(1). The employer's interference need not be "effective" to give rise to a FMLA interference claim—in other words, even an employee who does take her FMLA leave may have a valid interference claim if her employer acted "with a reasonable tendency to 'interfere with, restrain, or deny' the 'exercise of or attempt to exercise' an FMLA right." *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 165–66 (D.C. Cir. 2015).

Courts evaluate FMLA retaliation claims under the familiar *McDonnell Douglas* burden-shifting framework. *Waggel*, 957 F.3d at 1375. The plaintiff must establish a *prima facie* FMLA retaliation claim, which has three elements: "(1) the exercise of protected FMLA activity; (2) an adverse employment decision; and (3) a causal connection between the protected activity and the adverse action." *Id.* The employer can rebut that *prima facie* case "by putting forward evidence of a legitimate, nonretaliatory reason for the adverse action." *Id.* Once the employer does so, the burden shifts to the plaintiff to identify evidence of pretext. *Id.* Although temporal proximity between protected activity and adverse action can establish a *prima facie* case of retaliation, "dislodging an employer's nonretaliatory explanation as pretextual . . . requires 'positive evidence beyond mere proximity.'" *Id.* at 1376 (quoting *Minter v. District of Columbia*, 809 F.3d 66, 71–72 (D.C. Cir. 2015)).

   1. *Jiggetts' FMLA Claim*

The parties agree that Jiggetts received approval to take FMLA leave on August 20, 21, and 25, 2014 and to work half days (from 7:00 am to 12:00 pm) from August 26 through September 16, 2014. ECF 62-1 ¶ 65. The parties also agree that Jiggetts notified Martinez-Vega and Cipullo that she would be taking FMLA leave on those dates. *Id.* Generally, the statute of limitations for a FMLA violation is two years. 29 U.S.C. § 2617(c)(1). But in cases such as this, where the challenged acts occurred more than two years but fewer than three years before the litigation, a plaintiff may still recover for "willful violations" of the FMLA. *Id.* § 2617(c)(2). "A violation of the FMLA is willful if the employer 'kn[ew] its conduct to be wrong or ha[d] shown reckless disregard for the matter in light of the statute.'" *Murphy v. District of Columbia*, 390 F. Supp. 3d 59, 67 (D.D.C. 2019) (quoting *Cooper v. Henderson*, 174 F. Supp. 3d 193, 205 (D.D.C. 2016)).

Jiggetts contends that the District of Columbia willfully interfered with her FMLA leave when Cipullo, while she was on part-time leave, peppered her with work-related emails, assigned her tasks that were disproportionate to her work schedule, and berated her for failing to complete those tasks while she was taking leave. *See* ECF 59-1 at 138–42; ECF 62 at 27. For the reasons explained below, the Court finds that this claim survives summary judgment.[18]

Jiggetts testified that "there were times when Mr. Cipullo would ask me to do things that would take me past 12:00" during the period in which she was taking intermittent FMLA leave.

---

[18] The Court does not understand Jiggetts to be arguing that she was terminated in retaliation for taking FMLA leave, and therefore considers only whether Jiggetts' FMLA interference claim survives. Jiggetts states in passing that she "was approved for FMLA leave on August 20, 2014, which entitled her to 'job-protected unpaid leave for a 12-month period,'" and "was terminated before her year of job-protected FMLA leave expired." ECF 62 at 27 (quoting August 2014 FMLA approval letter). But that misconstrues (and misquotes) the FMLA approval letter Jiggetts herself submitted as evidence. *See* ECF 62-9. The letter in fact states that Jiggetts was "entitled to up to 12 weeks of job-protected unpaid leave during a 12-month period." *Id.* As explained above, Jiggetts took that job-protected leave in August and September 2014. She was not on FMLA leave when she was terminated.

ECF 59-1 at 138. Jiggetts points to three examples of such interference. First, Cipullo wanted Jiggetts to attend a training that began after 12:00 PM, and "he had a problem" with the fact that Jiggetts could not do so because of her FMLA leave. *Id.* at 138–139; *see* ECF 62-10 at 1–2. Second, Cipullo "would send [Jiggetts] emails asking [her] to research something and get back to him" after she had already left for the day and give her only a short time frame in which to complete the task. ECF 59-1 at 139; *see, e.g.*, ECF 62-10 at 3 (email sent from Cipullo to Jiggetts on September 11 around 6:00 PM, asking Jiggetts to complete a task "by noon tomorrow"). Per Jiggetts, this "didn't allow [her] time to even do the task" and Cipullo would then "reprimand" or "berate" her for that. ECF 59-1 at 139. Third, in an email exchange with Cipullo dated September 10, Jiggetts stated: "in order to get this research done, and this email out, it required that I stay past 12:00 noon (it's now 1:00pm) . . . I will likely have to do the same tomorrow for the follow up work you requested I do." ECF 62-10 at 4.

The District disputes whether Jiggetts ever stayed in the office past 12:00 PM while she was on intermittent FMLA leave, pointing to Jiggetts' own testimony that suggests she refused to do so. *See* ECF 66 at 29; ECF 59-1 at 142–43. But there is at least some evidence in the record that indicates Jiggetts did stay at the office past 12:00 PM—notably, the email exchange with Cipullo where she alerted him that she had spent at least one hour of her FMLA leave time at the office to conduct research he had requested. *See* ECF 62-10 at 4. This is a genuine dispute of material fact which the Court cannot resolve on a motion for summary judgment.

Courts have recognized that "work requests during FMLA leave can constitute interference." *Mammen v. Thomas Jefferson Univ.*, 462 F. Supp. 3d 518, 525 (E.D. Pa. 2020); *see Smith-Schrenk v. Genon Energy Servs., LLC*, No. H-13-2902, 2015 WL 150727, at *9 (S.D. Tex. Jan. 12, 2015) ("The general consensus among courts is that reasonable contact limited to

inquiries about the location of files or passing along institutional or status knowledge will not interfere with an employee's FMLA rights; however, asking or requiring an employee to perform work while on leave can constitute interference."). Considering both Jiggetts' testimony and the emails she identifies, and viewing that evidence in the light most favorable to her, a reasonable jury could conclude that Cipullo willfully interfered with Jiggetts' FMLA leave by requiring her to work during her leave hours, assigning her more work than she could complete given her intermittent FMLA leave, and berating her when she could not complete that work. *See, e.g.*, *Arban v. W. Pub. Corp.*, 345 F.3d 390, 402 (6th Cir. 2003) (holding that plaintiff had a viable FMLA interference claim where he testified that, during his medical leave, his employer "called him on several occasions and requested that he provide customer lists and pending sales"); *Smith-Schrenk*, 2015 WL 150727, at *10 (allowing FMLA interference claim to go forward where the plaintiff's employer asked her, during her FMLA leave, to update case files, complete a safety review project, and "personally deliver the safety review to the office").

A jury could also find that Jiggetts was prejudiced by that interference because she was required to spend unpaid leave hours working. *See Smith-Schrenk*, 2015 WL 150727, at *11 ("[A] factual dispute exists regarding whether plaintiff was required to work while on unpaid leave, and therefore, either lost compensation or suffered other damages as a result of the alleged FMLA interference."); *Cobbs v. Bluemercury, Inc.*, 746 F. Supp. 2d 137, 144 (D.D.C. 2010) ("Prejudice exists where an employee loses compensation [or] sustains other monetary losses as a direct result of the violation . . . ." (citing 29 U.S.C. § 2617(a)(1))). The Court therefore denies Defendants' motion for summary judgment as to Count XI.

### 2. *Cooper's FMLA Claims*

Cooper was approved for intermittent FMLA leave beginning on April 13, 2015. *See* ECF 58-10 at 1. She argues that her supervisor, Belinda Carr, interfered with her FMLA rights or

retaliated against her for taking FMLA leave by "send[ing] her emails all day demanding information she had already provided," "continu[ing] to implement an Employee Improvement Plan by demanding Cooper produce reports and other data she never requested before," and "demanding [she] and her staff work in an environment that exposed them to individuals being able to grab and spit on them." ECF 63 at 13. Cooper does not cite to any record evidence to support these claims. *See id.* No party has submitted any documents, or cited to any sworn testimony, that could give rise to Cooper's FMLA claims. Nor can the Court identify any evidence that Cooper's supervisors required her to "work in an environment that exposed [her] to individuals being able to grab and spit on [her]." *Id.* And the fact that Carr "continued to implement an Employee Improvement Plan" that was instituted *before* Cooper took FMLA leave cannot give rise to an FMLA retaliation claim. *Id.*; *see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (holding that "[e]mployers need not suspend previously planned [adverse actions] upon discovering that" a plaintiff has engaged in protected activity, "and their proceeding along lines previously contemplated . . . is no evidence whatever of causality"). In short, no reasonable jury could conclude, on the record before this Court, that Cooper's employers interfered with her FMLA leave or retaliated against her for taking leave. The Court therefore grants Defendants' motion for summary judgment as to Count XII.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment as to Cooper, ECF 58, is **GRANTED**. Cooper is therefore **DISMISSED** from the case. Defendants' motion for summary judgment as to Jiggetts, ECF 59, is **DENIED** as to Counts VI and XI, and otherwise **GRANTED**.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: March 31, 2025